Paul LILLY, individually and on behalf of all others similarly situated, Plaintiff,

and

Christopher McKinney, et al., Plaintiffs-Intervenors,

v.

HARRIS–TEETER SUPERMARKET, a corporation, Defendant.

Richard GREGORY, individually and on behalf of all others similarly situated, Plaintiff,

v.

HARRIS–TEETER, a corporation, Defendant.

Edward PORTER, individually and on behalf of all others similarly situated, Plaintiff,

v.

HARRIS–TEETER, a corporation, Defendant.

Nos. C–C–76–191, C–C–79–130 and C–C–79–137.

United States District Court, W. D. North Carolina, Charlotte Division.

July 13, 1982.

Michael A. Sheely and Joyce M. Brooks, Sheely & Brooks, Charlotte, N. C., and Shelley Blum, Raleigh, N. C., for plaintiffs.

John O. Pollard and Richard Kane, Blakeney, Alexander & Machen, Charlotte, N. C., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

McMILLAN, District Judge.

Decided: August 15, 1980 by *Memorandum of Decision* on file. 503 F.Supp. 29.

June 25, 1982 by *Supplemental Memorandum of Decision*

This is an action brought pursuant to 42 U.S.C. § 1981 and 2000e *et seq.* Mr. Lilly filed his Complaint on June 18, 1976. Subsequent to Motion by plaintiff and the August 3, 1979 Order of the Court, the intervention of Christopher McKinney, Philip Reed, John LeGrand, Ken Bailey, Frank Sullivan, James Mobley, Shirley Gatewood, Jerome Gary, Curtis Jones, Woodrow McManus, Roy Torrence, Hazel Fisher, John Johnson, Willie Hunt, Michael McVay, Roosevelt Patterson, Willie Covington, William Carrothers, Trevesant Goodwin, and Richard Burch was allowed in Case Number 76–191. Edward Porter filed his Complaint (Case Number C–C–79–137) on April 27, 1979. Richard Gregory filed his Complaint (Case Number C–C–79–130) on April 25, 1979. Gregory, pursuant to his Motion and Order of the Court, was allowed to intervene in *Lilly.* All of these cases were consolidated for trial. Plaintiffs sought injunctive relief to remedy allegedly unlawful employment practices and to provide specific relief for each individual who suffered from these practices. Based upon the evidence and exhibits, and after hearing and weighing the evidence, deciding on the credibility of the witnesses, viewing the demeanor of witnesses, considering the interests of witnesses, and the arguments of counsel, the Court, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, makes the following:

## FINDINGS OF FACT

### I. JURISDICTION

1. This Court has jurisdiction pursuant to 28 U.S.C. § 1343 and 42 U.S.C. § 2000e–5(f).

2. The plaintiffs have complied with the procedural requirements of Title VII (42 U.S.C. § 2000e *et seq.*) (Trial Transcript (hereinafter Tr. _____) 161, 162, 688–690; Plaintiff Trial Exhibits (hereinafter P. E. _____) 17, 27, 28).

### II. PARTIES

3. Plaintiffs Paul Lilly, Christopher McKinney, Philip Reed, John LeGrand, Ken Bailey, Frank Sullivan, James Mobley, Shirley Gatewood, Jerome Gary, Curtis Jones, Woodrow McManus, Roy Torrence, Hazel Fisher, John Johnson, Willie Hunt, Michael McVay, Roosevelt Patterson, Willie Covington, William Carrothers, Trevesant Goodwin, Richard Burch, Richard Gregory, and Edward Porter are black adult residents of the counties of Orange (Lilly), Lincoln (Reed), Gaston (Porter), and Mecklenburg (remainder), North Carolina.

4. Defendant Harris-Teeter (the "Company" or "defendant"):

(a) is a corporation which transacts business in North Carolina;

(b) is involved in the retail grocery business;

(c) is a person within the meaning of 42 U.S.C. § 1981, and an employer within the meaning of 42 U.S.C. § 2000e(b). (Tr. 688–690).

## III. INTERVENTION

5. Plaintiffs Christopher McKinney, Philip Reed, John LeGrand, Ken Bailey, Frank Sullivan, James Mobley, Shirley Gatewood, Jerome Gary, Curtis Jones, Woodrow McManus, Roy Torrence, Hazel Fisher, John Johnson, Willie Hunt, Michael McVay, Roosevelt Patterson, Willie Covington, William Carrothers, Trevesant Goodwin, and Richard Burch filed a Motion to Intervene on April 24, 1979 in Case Number 76–191. Intervenor Richard Gregory filed a separate action (C–C–79–130) and a Motion to Intervene in C–C–76–191.

6. At the time said plaintiffs filed their Motion to Intervene, they were members of the class certified by the July 22, 1977 Order of the Court.

7. At the time intervention was sought, and as borne out by the evidence at the trial:

(a) The persons listed in paragraph 5 claimed an interest in the transaction is the subject of *Lilly v. Harris-Teeter*, Number C–C–76–191.

(b) Disposition of the case may, as a practical matter, impede or impair their ability to protect their interests.

(c) The claims of the applicants have common questions of law and fact with the claims in the existing case.

(d) The allowance of the motions did not unduly delay or prejudice the adjudication of the rights of the original parties.

8. Intervention was sought to state claims under both 42 U.S.C. § 1981, § 2000e *et seq.*

## IV. EMPLOYMENT PRACTICES

9. Harris-Teeter operates its main office, distribution center (warehouse), and some fourteen retail grocery stores in Mecklenburg County.

10. Between August, 1976, and the trial of this action the defendant's employment practices included: No notices of vacant jobs were posted at any of the locations before 1979; there were no educational requirements for job positions; there were no written job descriptions; regular written job performance evaluations were limited to office employees, merchandisers, and store managers; there were no criteria as to what factors were to be considered in promotion; and, an employee did not have to ask in order to be considered for promotion at any of the locations. (Tr. 540–543, 689–690; Deposition of C. L. Teeter, 27, 33, 36–38).

11. The distribution center (warehouse) has four departments: grocery, meat, frozen food-produce, and transportation. Each department had two shifts. The starting times of various employees on the same shifts are staggered. Both receiving and shipping functions are carried out at the warehouse. Order puller, order selector, order picker, and picker are synonymous terms for the same position. (Tr. 698–702; Defendant's Trial Exhibit (hereinafter D. E.) 71).

12. A warehouse leadman is a working supervisor who assigns duties and performs the same duties as his subordinates (*e.g.* a leadman over pickers will assign duties but he has primary duties of a picker). (Tr. 712).

13. The factors utilized in promotion at the warehouse were "character," "integrity," "good sound morale," "correct attitude," and "initiative." These criteria had no written definitions and in each case were defined by the particular management personnel involved in a promotion decision. Those criteria were capable of different definitions. (Tr. 736–41, 918, 987–993; D.E. 75).

14. Mr. Ralph Wilson, a white manager of Distribution Operations, kept a *mental* list of employees who wanted jobs. Mr. Penney, a white warehouse manager, maintained a written list of warehouse employees who wanted transfers between December, 1977 and January, 1979. (Tr. 711, 736–741, 1177–1180; D.E. 112).

15. The posting of warehouse jobs started in January, 1979. Leadman jobs were posted in the summer of 1979. (Tr. 711, 736–41).

16. The defendant contended that, in order to be promoted to a warehouse leadman, an employee had to be on the same shift and in the same department as the opening. The defense to the warehouse plaintiffs' promotion claims was grounded on this "same shift/same department" policy/practice. Whether this policy/practice existed during the time periods in question is in dispute. The policy was unwritten (Tr. 928, 990). If the policy existed, it was discriminatorily applied in that: (i) there was no showing that any white person was denied a leadman position because of the practice; (ii) from the record evidence, only blacks were denied promotions because of the practice; (iii) the policy/practice was used to justify the denial of particular job assignments (Tr. 952); (iv) white employees were promoted or transferred across shift and/or departmental lines to leadman or foreman trainee positions (Weaver, Fowlkes, Givens); (v) more experienced black employees, (Mobley, McKinney, Bailey) all of whom met the same shift/same department requirement, were denied leadman positions some of which were filled by whites who crossed shift and/or departmental lines to fill those positions (Tr. 928, 988–990; Findings 25, 27, 34 *infra.*)

17. The promotion claims of plaintiffs Mobley, Patterson, Johnson, Sullivan, and LeGrand were defended on the basis of the same shift/same department policy. The Court finds that this policy was not the reason those plaintiffs were denied promotions (Tr. 110–112, 351–352, 384–385, 520, 917, 918, 928, 933–941, 952–995, 1071; D.E. 81).

18. Refusals by blacks to take jobs on particular occasions, regardless of circumstances, were carefully remembered, but the blacks were never asked whether they had changed their minds or whether their circumstances had changed. See Findings concerning Sullivan (32) and Patterson (29).

19. The defendant contended that some of the whites selected for promotion were better qualified because of their previous job experience (e.g. Allen, Hanson). Previous job experience was not systematically recorded. Relevant job experience of qualified blacks, whether listed on an application form or communicated orally, was often ignored or disbelieved (Reed, McKinney, Patterson, LeGrand, Torrence). The previous job experience of white promotees was typically remembered, explored, and utilized (e.g. Hanson). Information concerning prior experience, job performance, etc., was conveyed by word of mouth from one level of supervision to another. In cases where black and white applicants described their previous job experience in a substantially identical fashion, the white applicant's experience was used as a basis for promotion, while the black applicant's experience was ignored. (Tr. 194–195, 513–514, 247–248, 263, 741, 752, 848, 859–862, 864, 868, 752, 1013; D.E. 75, 79, 92).

20. Personnel practices at the retail stores included: Store supervisors (managers) made promotion recommendations by the store supervisor. Promotions were limited to persons recommended by the store managers. The district manager agreed with the store manager's recommendations 90–95 percent of the time. The district manager ultimately decided who would be promoted, transferred, demoted, hired, or terminated for all positions up to the department-head level. Job vacancies were not posted. Employees transferred from one store to another. In the stores managed by Mr. Higgins (white) (nine stores in Mecklenburg County) there were no black store managers between 1974 and 1977. Between 1974 and 1977, there was no written promotion system, no written description of factors to be considered in promotion decisions, and no regular system of job performance evaluation. (Tr. 784, 838, 853–856, 860).

## V. CLAIMS OF PLAINTIFFS

21. Edward Porter, in response to a newspaper advertisement, applied for a

tractor trailer driver position at Harris-Teeter on March 31, 1975. Porter's application listed 22 months of prior experience as a road driver. Porter's other truck experience (ten years) was not listed because he had used up all available space on his application. Porter was neither interviewed nor contacted by Harris-Teeter. Porter was qualified for the driver position. In June, 1975, Porter saw an identical advertisement for tractor trailer drivers. Eight persons were hired as truck drivers between 5/7/75 and 7/24/75, all of whom are white. The first person hired after Porter applied (K. Mills, white) quit on 5/16/75. Harris-Teeter stated it would not rehire Mills. The defendant contends that Porter was not hired because no openings existed when he applied. However, within 120 days of Porter's application, nine whites were hired as truck drivers. Two of the hirees had less driving experience than Porter listed on his application. All of the white hirees had less driving experience than Porter. The percentage of black drivers decreased from 50.7% in 1975 to 27.6% in 1977. Porter was not hired because of his race. He is entitled to appropriate relief in Stage 2 proceedings (Tr. 6–14; P.E. 27; D.E. 17, 19, 22, 24).

22. Philip Reed presented two promotion claims and a discharge claim. Reed was hired as a produce clerk in 6/76. He had applied for a management position. He had three years of grocery store management experience, including six months in produce management. Reed worked at two stores between 6/76 and 4/77. On several occasions Reed asked the District Manager (Higgins, white) and the store manager (Foye, white) about a promotion to vacant produce manager positions. The first vacancy was filled on 10/8/76 by A. Wilson, white. Wilson, a produce clerk, had 18 months experience with Harris-Teeter. Wilson, who had no management experience, was replaced by W. Allen, white, on 11/8/76. Allen was selected on the basis of his Harris-Teeter experience as a produce clerk and an assistant produce manager of six months. Reed was not considered for either vacancy. He was more qualified than either of the promotees. Reed re-ceived a warning on 12/5/76. It played no part in his non-selection. The Court gives no credence to the reasons advanced by Harris-Teeter for failing to promote Reed. In 1975–76, whites received 96.3% of the promotions in supervisory/management jobs at the stores, and constituted 95% of the officials and managers at the stores. Reed was denied a promotion because of his race. He is entitled to appropriate relief in Stage 2 proceedings. Reed was not dis-charged because of his race. (Tr. 20–30, 774, 776, 780, 857–859, 861–863, 869; P.E. 5, 23, 26; D.E. 55, 79).

23. Paul Lilly was employed at the warehouse between 7/7/74 and 1/10/75. Within 90 days of his hire, Lilly received two pay raises. Lilly's supervisors were all white. Lilly heard Watson (supervisor) talk about "how he used to kick niggers' asses at the Armour plant before he came to work at Harris-Teeter." Watson denied this (Tr. p. 1107). On 1/8/75, Lilly went to C. L. Teeter, personnel director, and complained that blacks were being terminated for being late while whites laid out and were not terminated. Teeter denied the complaint. Both of these conflicts in the testimony are resolved in the favor of Lilly. On 1/10/75, Lilly was terminated by John Watson for allegedly miscounting beef. Lilly had been given the checking duties as a part of in-ventory control. After Lilly took over the checking duties, there was a noticeable im-provement in inventory control. Errors in the counting of the beef had been made at the stores. Watson did not check with the stores to see if any errors had been made there. Miscounting the meat was not the reason for Lilly's discharge. Lilly was dis-charged because of his race and his opposi-tion to racial discrimination. Lilly is enti-tled to appropriate relief during Stage 2 proceedings. (Tr. 44–59, 67, 70, 71, 73, 87, 88, 1107, 1113, 1114, 1165–66).

24. Richard Gregory worked for Harris-Teeter between 7/7/72 and 5/29/75. Greg-ory had nine years of previous grocery store experience. Gregory worked as a stock clerk in store number 2 until he was pro-moted to grocery manager on 5/27/74. As

a grocery manager, Gregory's duties were to order merchandise, take inventory, check for shortages, overages, and damage in the merchandise, make sure that the work area was clean, and keep the shelves stocked. He supervised seven employees. He was not warned about his job performance as a grocery manager. He was informed by his supervisors that he was doing a good job. Gregory terminated a white stock clerk who told Gregory that he was not going to work for a nigger when Gregory instructed him to help unload a truck. The white store manager reinstated the clerk. (A Harris-Teeter witness obliquely denied this. Tr. 809–10) Gregory's testimony was corroborated (Tr. 181). The Court resolves the credibility issue in favor of Gregory. On 1/20/75 Gregory was demoted to a stock clerk at another store. Mr. Higgins (white, territory manager) was present when Gregory was told by Mr. Crowell (black, co-manager) that he was being demoted because the storeroom was unclean. Higgins made the decision that Gregory would be demoted. Gregory was sent to store number 9 as a stock clerk. Gregory left store number 9 as a stock clerk because of the demotion and harassment (e.g. (i) being written up for going to the doctor, (ii) being given more difficult aisles to stock (corroborated by another witness (Tr. 824)), and (iii) being kept later to perform job duties after other clerks went home) (denied by a Harris-Teeter witness (Tr. 833)). This issue of credibility is resolved in Gregory's favor. Gregory was replaced as grocery manager by Donnie Brock, white. After Brock became grocery manager, he was not given aisles to stock. Gregory, as grocery manager, had been assigned aisles to stock. Race was the reason for Gregory's demotion. Gregory was constructively discharged. He is entitled to appropriate relief in the Stage 2 proceedings. (Tr. 153–168, 181, 183–186, 807; P.E. 26). A white meat manager was "written up" 10 times between March-October of 1976, and was allowed to resign (Tr. 816–822; P.E. 26). The Court specifically credits the testimony of Howard and Pitts (Tr. 176–184) that Gregory performed his job as a grocery manager in a satisfactory manner.

25. James Mobley has been employed by Harris-Teeter since 4/14/74 at the warehouse in the meat department. Milk, dairy products, and meat are in the same department. Mobley's job duties prior to 4/78 included milk picking, unloading, and forklift driving. In the spring of 1976, a foreman (Crowley, white) told Mobley that he was "up" for promotion to leadman in the meat department. Terry Givens (white) received the job on 6/7/76. Givens was initially hired on 1/11/74, resigned 2/5/74 and was rehired 11/3/74. Mobley had more company and departmental experience than Givens. Givens' prior duties were solely picking meat; Mobley's duties involved more products. Mobley had also supervised Givens when Mobley served as a "fill-in" (temporary) leadman prior to Givens' promotion. Mobley's job performance had been praised by his supervisors. Mobley was never considered for Givens' job. Mitchell, a Harris-Teeter witness, made a comparison between Mobley and Givens (Tr. 926–927). This comparison has little, if any, weight since it was not made at the time of Givens' promotion. Mitchell's assertion that Givens had broader departmental experience is invalid since Mobley acted as Givens' leadman when he was a "fill-in" leadman. On 5/16/77, David Allison, white, was promoted to the meat department vacancy created by Givens' transfer to leadman in the produce department. Allison was hired on 5/18/76 as a picker without forklift duties. Mobley had both greater company and departmental experience, including that of "fill-in" leadman. Mobley was not considered for the job Allison was promoted to. Jeff Fowlkes, white, was rehired by Harris-Teeter in the warehouse in 5/76. Prior to then, Mr. Fowlkes has worked in various stores. In September or October, 1976, Fowlkes became the "defacto" leadman on the night shift in the produce department; he got the job title on 11/22/76. (Tr. 351–52, 384–85, 520, 933–41, 952–995, 1071; P.E. 26). Harris-Teeter stated that it did not promote Mobley to the Allison position because Mobley was on

strike. This reason is not valid since Mobley informed Harris-Teeter he was available for work eight to ten weeks before the Allison promotion. Harris-Teeter stated that it did not promote Mobley to the Fowlkes' position because Mobley was on a different shift in another department and because Mobley was on strike after 11/16/76. Mobley was present when Fowlkes started his "defacto" leadman duties. Mobley was denied these three promotions because of his race. He is entitled to appropriate relief in Stage 2 proceedings. In April, 1978, Mobley became a meat department leadman. (Tr. 97–116, 125, 384–385, 520, 926–27, 933–41, 995, 996, 998, 1163; P.E. 26; D.E. 81).

26. Jerome Gary was employed as a warehouseman between 9/18/74 and 6/23/78. Gary initially applied for a mechanic's position. He was promised a transfer to the garage as a mechanic when there was a vacancy. Gary was qualified to be a mechanic because of his prior experience and education. Gary made several requests for a mechanic's job between September, 1974 and the middle of 1975. Two white employees (H. Burris, S. Richards) transferred from the warehouse to mechanics' jobs during the 1975 period of Gary's requests. In 1975, four white and one black mechanics were hired. In 1976, fifteen white and one black mechanics were hired (P.E. 2). In 1975, four whites and one black were promoted or transferred to a mechanic position. (P.E. 3). In 1976, five whites and one black were promoted or transferred to a mechanic position. In the summer of 1975, Gary asked to be transferred from a standup (Raymond) lift to a sitdown lift. Mitchell denied that Gary made this request. This credibility issue is resolved in favor of Gary. Gary was qualified to operate a sitdown lift. Two junior whites were transferred from standup to sitdown lifts shortly after Gary's request. The sitdown lift pay was higher. Gary was denied a mechanic's job and a transfer to the sitdown forklift because of his race. He is entitled to appropriate relief at the Stage 2 proceedings. (Tr. 129–152, 968, 969; P.E. 26).

27. Christopher McKinney has been employed by Harris-Teeter since 6/18/75 at the warehouse in the dry grocery department. McKinney has been a forklift driver. When he expressed an interest in promotion, McKinney informed Harris-Teeter management of his 2½ years experience supervising six employees. He was on strike from 11/16/76 to 2/27/77 when he informed Harris-Teeter that he was available for work. McKinney performed his job well. In April, 1977, a junior white employee, Jeff Fowlkes, was promoted from produce leadman to foreman trainee in the grocery department. Foreman trainee is basically the same job as leadman (Tr. 1017). McKinney was not considered for the foreman trainee job. Mitchell testified that McKinney was not qualified because of a poor work record. When asked to examine McKinney's personnel file, Mitchell could not find any record of a warning due to poor job performance. Warnings were given to some employees for poor job performance. McKinney had more warehouse and departmental experience than Fowlkes. McKinney was qualified for the trainee job because of his experience. Michael Weaver (white, hired 11/24/76) was promoted on 5/30/77 from day shift picker to night shift dry grocery leadman. McKinney was not fairly considered for this job even though he was on the same shift and in the same department. McKinney was qualified for this job because of his prior experience. McKinney was denied the foreman trainee job and the leadman job because of his race. He is entitled to appropriate relief in Stage 2 proceedings. (Tr. 189–206, 1017, 1020, 1088–90, 1075–1078; P.E. 26; D.E. 81).

28. Roy Torrence was hired by Harris-Teeter at its warehouse on 9/18/74 as a maintenance (sanitation) employee. His duties included forklift driving, sorting damaged food, and rebuilding pallets. His prior work experience included supervisory duties and self-employment. Torrence trained a white employee of Harris-Teeter (Neal Mitchell, hired 5/12/75) who was promoted to foreman of the maintenance (sanitation) department on 6/16/75. Before Mitchell was hired, Torrence asked Dick

Jackson (sanitation department supervisor) for the foreman job to which Mitchell was promoted. Jackson told Torrence that he would never be a foreman or leadman as long as Jackson was there. Jackson denied this. (Tr. 1124, 1126). The Court resolves this credibility issue in favor of Torrence. On 8/15/78 a junior white employee (Earl Hanson, hired 11/16/77) was promoted to a sanitation leadman for the same shift and in the same department that Torrence worked. Torrence was never considered for the job that Mitchell got. Torrence was described by his supervisors (Mitchell, Jackson) as having "excellent attendance" and "excellent performance" five times between 9/24/74 and 6/16/75. (Tr. 1016, 1126, 1132–33). These ratings conflict with the testimony of defendant's witnesses (Tr. 1122–23, 955). The Court resolves the conflict in favor of Torrence and finds that he was a good employee. Torrence filed a grievance for not being promoted to the position Hanson received. The criteria used in comparing Torrence and Hanson were subjective. Torrence was denied these jobs because of his race. He is entitled to appropriate relief in Stage 2 proceedings. (Tr. 244–60, 1016, 1124, 1126, 1132, 1133; P.E. 26; D.E. 75, 91, 92).

29. Roosevelt Patterson worked for Harris-Teeter during parts of 1972 and 1973. He has been employed continuously at the warehouse since 10/12/73. His prior work experience included assistant gas station manager and assistant warehouse manager positions. Since he was rehired in 10/73, Patterson's classifications include night shift meat picker and day and night shift forklift driver, all of which were in the meat department. In 9/77 Patterson was in "receiving" temporarily. He was the only person performing the receiving duties. Two persons normally performed the receiving duties. Patterson asked for assistance and did not get any. Patterson asked to return to his lift job because of the failure to provide help. When whites worked as receivers, there were two of them except for one instance where a white employee performed the job alone. Patterson was on strike from 11/17/76 until 2/27/77 when he informed Harris-Teeter that he was available for work. He returned to work on 3/3/77 as a lift driver in the freezer department. Patterson asked for leadman jobs. He was told that since he had left the receiver's job, he would not become a leadman. Patterson had worked in various departments as a receiver, picker, and a lift driver. His work performance was praised by warehouse management. The following junior whites were promoted:

(a) Jeff Fowlkes was hired May, 1976 as a produce picker. He was made a *de facto* produce leadman in September or October, 1976, and given the title of leadman on 11/22/76. He was made a foreman trainee in 4/77 (grocery) and a foreman in the grocery department on 9/22/77.  ..

(b) Terry Givens was hired as a picker on 11/3/74. He was promoted to meat leadman on 6/7/76, and to foreman on 8/27/77.

(c) David Allison was hired on 5/19/76 as a meat picker and was promoted to meat leadman on 5/16/77 and to foreman on 6/25/78.

(d) Clyde Kiker was hired on 11/23/76 as a produce picker. He was promoted to a produce leadman on 8/7/77, nine days after a warning on 7/29/77 that he had been tardy six times between 6/5/77 and 7/29/77. He was made a foreman on 6/25/78.

(e) Neal Mitchell was hired on 5/12/75. He was promoted on 6/16/75 to foreman (sanitation). In 9/75, he was transferred to the night shift (sanitation) as a foreman. (Tr. 277–8).

Mr. Patterson was qualified for those jobs because of his experience and his job performance. Harris-Teeter contends that Patterson was not eligible for any of the promotions since Patterson was either in a different department or on a different shift. (Tr. 999–1001). This reason is not given credence. See Finding 16, *supra*. He was not considered for any of these positions. Patterson was denied promotion because of his race. He is entitled to appropriate relief in Stage 2 proceedings. (Tr. 262–302, 928, 999–1003; P. E. 26; D. E. 81).

30. Curtis Jones was hired by Harris-Teeter in 7/74. His prior work experience included loading and unloading freight. In 7/78, Jones became a dry grocery picker. He was then transferred to the "salvage" dock, where he unloads pallets weighing 30 to 40 pounds. In the spring and fall of 1976, Jones asked for a job as a rail unloader. This job involves the unloading of cases with an average weight of 30 to 40 pounds, and an upper limit of 60 to 70 pounds. The defendant contended that Jones was not promoted because he had back problems. Jones was never asked by the supervisor of the rail dock about his back. His medical problems were minor. Two whites (James Lamb, Eddie Kistler) were hired as rail dock unloaders after Jones asked about the job. Jones was qualified for this job because of his prior work experience. The statistics show that Harris-Teeter hired seven whites and no blacks as unloaders. Jones was denied this job because of his race. He is entitled to appropriate relief in Stage 2 proceedings. (Tr. 303–311, 1108, 1112; P.E. 2, 26).

31. John Thomas Johnson: Johnson was employed in February of 1975 as a picker and lift operator in the meat department and later in the produce department. He was qualified and available for the lead job and for the foreman job to which Jeff Fowlkes was promoted. Fowlkes was slotted into the lead man's job in October of 1976, and received the actual job title in November, 1976. Johnson's complaint as to Fowlkes (and as to David Allison and Clyde Kiker) relates to promotions which occurred in April, 1977 (Fowlkes); May, 1977 (Allison); and August, 1977 (Kiker). Although Johnson was available and qualified from the time he abandoned the strike in February of 1977, he did in fact turn down a night job at $4.80 so that he could stay in a day job at $3.90 and look after his children. (His actual testimony on this issue was evasive, and it was only after some prodding from the Court that he ever gave a clear answer about the "family reasons" which moved him to reject the higher paying job). Defendant says that his turning down the night shift work was the reason he was not considered for promotion. I am not sure that I ought to take that reason at face value, but I am unable to conclude that it was solely pretext. Relief will not be ordered for John Thomas Johnson.

32. Frank Sullivan was hired by Harris-Teeter at its warehouse in 7/69 as a milk picker. Between February and June, 1972, Sullivan was involved in foreman training. Sullivan also worked as a receiver and as a "slot master." In the summer of 1973, Sullivan was informed by management personnel that he was a leadman. Mitchell announced this to the entire department. Sullivan was a leadman between 7/73 and 2/74. In 2/74, Mitchell told Sullivan that he was a slot master and not a leadman because Sullivan had left the foreman trainee program earlier. Sullivan was on strike from 11/17/76 until 2/27/77, when he informed Harris-Teeter that he was available for immediate employment. Sullivan returned to work as a meat picker in 6/77. He subsequently became a dry grocery picker, frozen food lift driver and a grocery slot master. Sullivan, assigned to the meat department, worked in all of the departments because of his duties. Sullivan was informed by management personnel that his job performance was good. Junior white employees were promoted to leadman positions as follows:

(a) Curtis George Hamilton, hired 9/22/70, was promoted to leadman on 10/25/76 and foreman on 11/15/76. Sullivan worked on the same shift and in the same department. Hamilton became Sullivan's leadman as a result of the promotion.

(b) Clyde Kiker, hired 11/23/76, was promoted to leadman on 8/7/77 and foreman on 6/25/78.

Harris-Teeter advanced two reasons for Hamilton's promotion. The first was that Hamilton "had much more experience in receiving." The evidence reveals that, prior to Hamilton's promotion, Sullivan and Hamilton had the same amount of experience. Furthermore, Sullivan had experience as a leadman and had performed a broader range of job duties than either of

the promotees. The second reason was that four years earlier, in 1972, Sullivan had requested to leave a night shift foreman trainee position in 1972. This was the same reason used to remove Sullivan as a leadman in 1974. Those reasons are not persuasive. As to Kiker, the defendant contended that Sullivan was not considered for Kiker's job because he was in a different department. This is not a valid reason. See Finding 16, *supra.* Sullivan was qualified to perform these jobs because of his job performance and his experience at Harris-Teeter. Sullivan had more company and departmental experience than Hamilton. Sullivan was denied the Kiker and Allison positions because of his race. He is entitled to appropriate relief in Stage 2 proceedings. (Tr. 377–400, 944–951, 1006, 1161; P.E. 26; D.E. 81).

33. Kenneth Bailey was hired by Harris-Teeter as a stocker at its warehouse on 4/17/74. His next position was that of loader. He was classified as a forklift driver on 8/4/75. He was on strike between 11/17/76 and 2/27/77 when he informed Harris-Teeter that he was available for employment. He returned on 7/18/77 as a picker. On 8/29/77, Bailey was classified as a lift driver. Bailey worked only in the dry grocery department. Two junior whites were promoted to leadman in the dry grocery department on the same shift that Bailey worked.

(a) Wade Carpenter, hired on 6/8/76 as a picker, was promoted to leadman on 7/10/78. Carpenter regularly performed the duties of a picker prior to his promotion to leadman. He supervised pickers, loaders, and forklift drivers as a leadman. Bailey had performed all of these duties at various times. Carpenter went on strike when Bailey did.

(b) Richard McClain, hired as a picker in 12/75, was promoted to leadman on 6/4/79. As a picker, he was the "shortman." This meant that he did not assemble full orders. McClain replaced Carpenter as the leadman. Bailey performed a broader range of duties than McClain. Bailey was not considered for either position even though he was in the same department. Bailey was qualified for said positions since he performed all of the departmental duties, and had more departmental experience than either promotee. Bailey was denied promotion because of his race. He is entitled to appropriate relief in the Stage 2 proceedings. (Tr. 462–509, 1185; P.E. 26; D.E. 81).

34. John LeGrand was hired by Harris-Teeter on 7/8/74 as a frozen food picker. His next position was frozen food loader. LeGrand was trained to act as a "fill-in" leadman, and in fact did "fill in" as a leadman until Randy Avery (white) was hired. LeGrand trained Avery in the duties of a "fill-in" leadman. Avery then assumed LeGrand's place as "fill-in" leadman. Avery was offered a full-time leadman's position, which he refused. LeGrand was never offered this job. LeGrand informed Harris-Teeter management of his prior experience as a leadman at a textile mill. LeGrand was on strike from 11/17/76 until 2/27/77 when he informed Harris-Teeter that he was available for employment. He returned in 8/77 as a picker. He was classified as a forklift driver in 7/77. Junior whites were promoted to leadman positions as follows:

(a) Doug Dover, hired on 10/31/74 as a picker, was promoted to night shift leadman in the produce department on 1/26/76. In this job Dover set up the trucks for the produce department and put together the orders. LeGrand performed these same duties in the freezer department. On 8/30/76, Dover left this position.

(b) Terry Givens was rehired on 11/3/74, after previous employment of three weeks early in 1974. On 6/7/76, he was promoted to leadman in the meat department on the night shift.

(c) Jeff Fowlkes was hired 5/16/76, as a produce picker. On 11/22/76, he was formally given the job title of leadman in the produce department. He replaced Dover. Fowlkes was the "de facto" leadman in that he performed the duties of a leadman in September and October, 1976. Fowlkes supervised the loading duties in September and October, 1976. LeGrand had more ex-

perience in loading. LeGrand was considered ineligible for the loading duties that Fowlkes got because he was in a different department. LeGrand was qualified to perform the leadman duties because of his prior job performance and his experience, including supervision. LeGrand was considered ineligible for the leadman positions because he was on a different shift and/or department. LeGrand was denied promotion because of his race. He is entitled to appropriate relief during Stage 2 proceedings. (Tr. 510–539, 951–953, 1010, 1039, 1040; D.E. 81; P.E. 26).

## VI. MAINTENANCE OF CLASS ACTION

35. Plaintiff Lilly moved for class certification on or about 5/20/77. Defendant opposed said motion. By Order dated 7/22/77, this Court certified a class consisting of the following:

Plaintiff, and all blacks currently employed by defendant Harris-Teeter in its Mecklenburg County facilities; all blacks employed by Harris-Teeter in its Mecklenburg County facilities at any time since 7/20/74, who are not currently employed, and any blacks who are hired in the future, all of whom have been or will be subject to racial discrimination by Harris-Teeter in its employment policies of hiring, hiring into certain jobs, racially segregated job classifications, promotions, interviewing, termination, and discipline.

36. Intervenors McKinney, Reed, LeGrand, Bailey, Sullivan, Mobley, Gatewood, Gary, Jones, McManus, Torrence, Fisher, Johnson, Hunt, McVay, Patterson, Covington, Carrothers, Goodwin, Burch, and Gregory were certified as class representatives on August 3, 1979.

37. The initial class certification included the stores, main office, and warehouse located in Mecklenburg County.

38. No plaintiff worked at the main office. McManus, a warehouseman, sought a job at the main office. The jobs at the main office include clerical, middle management, and upper management jobs. (P.E. 1, 2). The class finally certified should be defined to exclude the main office.

39. At the time the original class was certified, the definition of the class included unsuccessful applicants for initial employment. The only claimant who presented an initial hiring claim was Porter. Porter never sought to be certified as a class representative.

40. There is no evidence in the record as to the number of unsuccessful black job applicants.

41. There is no class representative applicant for initial employment to protect the interests of applicants for employment.

42. All claimants (except Porter) were employed by Harris-Teeter at either retail stores or the warehouse. Their claims include discharge and job placement (demotion, transfer, promotion). Defendant has no written job descriptions, and presented little evidence concerning job duties. The evidence of job duties indicates that they are not difficult. (Tr. 22, 48, 49, 100–102, 135, 155, 157, 245, 378–79, 515, 864, 1108; P.E. 26–A). The overwhelming majority of jobs at the warehouse and stores have skills which are held by or are readily available to the general public. For example:

(a) At the warehouse, when one excludes supervisory and skilled jobs, the following proportions of the work force remain (P.E. 1): 1977: 86.1 ($^{347}/_{403}$); 1976: 89.9 ($^{525}/_{584}$); 1975: 90.8 ($^{377}/_{415}$). In 1975 and 1977 the excluded jobs included leadman positions (described as a working supervisor, Tr. 712), safety technician, battery repair, all mechanic jobs, garage superintendent, all foreman jobs, supervisors, servicemen, electricians, and refrigeration jobs. In 1976 the same jobs are excluded with the addition of foreman, trainee/leadman.

(b) Stores: If one excludes the management and skilled jobs, (e.g. managers, manager trainees, head cashiers, meat cutters) the following proportions of the entire work force remain (P.E. 1): 1977, 86.4% ($^{580}/_{671}$; 1976, 91.9% $^{1198}/_{1303}$); 1975, 90.5% ($^{1167}/_{1290}$).

43. Plaintiffs Reed and Gregory worked at store numbers 2, 9, 83, and 22. Each

store has the same basic range of jobs. Each store performs the same function—retail sale of food and other items commonly found in the supermarket. Defendant presented no evidence showing there was a difference in employment conditions among the various stores. The stores were under the direction of a territorial supervisor who had unilateral authority to hire, fire, and demote from the department head level and down. During the years in question, one territorial supervisor (Higgins) supervised nine of the fourteen stores in Mecklenburg County.

44. The size of the annual work force of Harris-Teeter at the stores and warehouse is approximately 1500–2000 persons (P.E. 1; D.E. 16–25). The overwhelming majority of jobs are basically those which have skill requirements which are held or readily obtainable by the general population. Employment conditions are generally the same. Employees are transferred and promoted between the stores and warehouse departments. Warehouse employees went into store management (e.g. Fowlkes, P.E. 26) and were offered store management trainee programs (e.g. Allison, P.E. 26).

45. Common features of the promotion and termination practices at the stores and warehouse are: a basically all-white supervisory work force; unfettered discretion as to whom to promote or terminate; unwritten subjective criteria for promotion and termination; no written job descriptions; no written regular job performance evaluations; and, the necessity of the recommendation of the immediate supervisor for promotion. Defendant did not present any evidence to show that the conditions of employment were significantly different between the stores and warehouse. The certified representatives have the same claims (promotion, discharge) as the members of the defined class.

46. Based upon the record in this case, the class to be certified should exclude the main office and be limited to the practices of termination and promotion. The final class should be defined as follows.

Plaintiffs Lilly, Gregory, Reed, Mobley, Gary, McKinney, Torrence, Patterson, Jones, Johnson, Gatewood, Sullivan, Bailey, and LeGrand, and all blacks currently employed by Harris-Teeter at its warehouse and store numbers 1, 2, 5, 8, 9, 22, 39, 52, 53, 55, 59, 62, 66, and 83 located in Mecklenburg County; and all blacks employed by Harris-Teeter (at said warehouse and stores) at any time since 7/20/74, who are not currently employed, all of whom may have been or may be subjected to racial discrimination by Harris-Teeter in its employment policies and practices in reference to terminations and promotions.

## VII. ISSUES OF CLASS DISCRIMINATION

### Terminations

47. The only written policy for terminations is set forth at P.E. 14, p. 210. This consists of a series of "DON'TS" which *may* result in discipline and/or discharge. The system of discipline varied from one supervisor to another. An employee could be terminated with or without prior warnings. The supervisory work force was overwhelmingly white. (Tr. 1030; P.E. 5).

48. The statistical evidence shows that:

(a) The following number of persons were terminated for the stated reasons:

Mecklenburg 1974–1978

| TYPE | W | W% | B | B% | TOTAL |
|------|------|------|------|------|------|
| All | 2786 | 81.9 | 616 | 18.1 | 3402 |
| Cause Involuntary | 586 | 71.9 | 229 | 28.1 | 815 |

| | | |
|---|---|---|
| Black for cause | = 37.2% | 229 |
| Black total terminations | | 616 |
| White for cause | = 21.0% | 586 |
| White total terminations | | 2786 |

The proportion of terminations for cause for blacks (37.2%) was much larger than the corresponding white figure (21%) (Tr. 576–78, 603–606, 1238, 1253; P.E. 34 (mistakenly referred to as 31 during the trial); D.E. 36).

(b) The pattern for 1974–1978 in Finding 48(a) is the same when individual years are examined. (P.E. 4, pp. 53–65).

Percentage of Involuntary (Cause) Terminations
of Total Terminations by Race

| YEAR | W | | B | |
|------|------|------|------|------|
| 1974 | 24.2 | (214/877) | 39 | (138/354) |
| 1975 | 29.0 | (225/774) | 52 | ( 74/142) |
| 1976 | 22.3 | (170/761) | 38.5 | ( 37/96) |

(c) The percentage of the black workforce subjected to involuntary (cause) terminations was much higher than the corresponding percentage of whites.

Percentage of Work Force Involuntarily
Terminated (For Cause)

| YEAR | W% | | B% | |
|------|------|------|------|------|
| 1975 | 14 (225/1869) | | 25 (74/300) | |
| 1976 | 9 (170/1794) | . | 13 (37/294) | |

P.E. 4 at pp. 63–65

(d) Between 1974 and 1978, blacks represented 28.1% of all involuntary (cause) terminations while they represented the following annual percentage of Harris-Teeter's Mecklenburg County workforce. (Tr. 1253; P.E. 34; D.E. 16–25): 24.5% (1974); 16.8% (1975); 13.9% (1976); 11.7% (1977–78).

(e) The foregoing data can be statistically tested. The test is the application of a well-defined Court-approved mathematical formula to data already found to be substantially reliable. This test was described by the United States Supreme Court in *Hazelwood School District v. U. S.*, 433 U.S. 299, 311–312, n.17, 97 S.Ct. 2736, 2743–44, n.17, 53 L.Ed.2d 768 (1977); and *Castaneda v. Partida*, 430 U.S. 482, 496–97, n.17, 97 S.Ct. 1272, 1281–82, n.17, 51 L.Ed.2d 498 (1977). A number of standard deviations of more than two or three beyond the expected supports a finding of discrimination undercutting a hypothesis that race was not a factor. *EEOC v. United Virginia Bank*, 615 F.2d 147, 151 (4th Cir. 1980), the Court, in discussing its application of the test, "recalculated" various factors. In *Garrett v. R. J. Reynolds*, 81 F.R.D. 25, 32–37 (M.D.N.C., 1978) the Court applied the same test to the statistical data presented by the parties. In the following tests the sample of total involuntary termination (815) and observed number of black involuntary terminations (229) remain the same. The only difference is the black percentage of the Harris-Teeter work force which is used.

(1) 1974–1978: The sample is 815 (Finding 48(a), *supra*); the black percentage of the Harris-Teeter work force is 15.4% (median annual percentage of work force between 1974–78 as set forth in Finding 48(d)); the observed number is 229; the expected number (total sample × black percentage of Harris-Teeter work force) equals 125.5; the difference (observed minus expected) is 103.5, the standard deviation (square root of sample × black percentage × white percentage) equals 10.304; and, the number of standard deviations beyond the expected equals 10.045 (difference divided by standard deviation).

(2) If the same test is used with a slightly different black percentage of the Harris-Teeter work force between 1974 and 1978: (15.7% computed by the addition of the annual black percentages as set forth above in Finding 48(d), and dividing the total by five years to obtain an annual average), the result is 9.725 standard deviations beyond the expected. If the same test is used with another slightly different black percentage of the Harris-Teeter work force between 1974–1978: (15.3%: 9715 whites, 1767 blacks, 11,482 total persons, D.E. 16–20, 21–25), the result is 10.149 standard deviations beyond the expected.

(f) 1975: The black percentage of the Harris-Teeter work force is 16.1% B (P.E. 4, p. 64); the sample has 299 total involuntary terminations (P.E. 4, p. 64); the observed number is 74 (P.E. 4, p. 64); the expected number is 48; the difference is 26; the standard deviation equals 6.356; and the number of standard deviations from the expected is 4.09.

49. In addition to the statistics, there are specific examples of the unequal operation of the termination policy. Lilly gave examples in his testimony of whites "laying out" who were not terminated, while blacks (who were tardy) were terminated. (Tr. 56, 69–71, 87–88). Another example involves Richard Gregory who was demoted without any record of prior written warnings, while Boyce Mullis was allowed to hold onto his

job in spite of numerous written warnings and finally given an opportunity to resign after those warnings. See Finding 24, *supra.*

50. The foregoing statistics support an inference that the application of the termination practice had a greater impact upon blacks. Defendant offered no explanation for the statistical difference. The evidence reveals that the criteria utilized in the termination system were within the unfettered discretion of the supervisors. The criteria were not in written form. The application of such a practice, as shown by the foregoing statistics, can and does have an adverse impact on blacks. There are specific examples of whites receiving warnings only after extensive absences or tardiness, or receiving no warning at all:

(a) Steven Dutch: Dutch was tardy 16 times in 2 months before receiving a written warning. P.E. 26 at 104–105;

(b) Michael Frick: Frick missed 38.4% of the hours between 2/13/78 and 4/7/78. He had ten unexcused absences between 4/4/78 and 6/19/78. He had no warnings. (P.E. 26 at 113–116);

(c) Clyde Kiker: Kiker was counseled on 7/29/77 about being tardy six times between 6/5/77 and 7/29/77. He was promoted to leadman on 8/7/77. (P.E. 26 at pp. 132–133).

*Promotions*

52(a) The promotion practice has the features set forth in Findings 10–20 *supra.*

(b) The recommendations of the supervisor (foreman) was necessary for promotion both at the stores and warehouse. The supervisory work force at the stores and warehouse was overwhelmingly white. At the stores in 1975 and 1976, the supervisory force was at least 95% white, and it was at least 91% white at the warehouse (P.E. 5). There have been no black supervisors at the warehouse. (See Findings 18–21, *supra*; Tr. 468, 470). In 1975, 11 of 13 stores had an all-white supervisory work force; in 1976, 10 of 13 stores had an all-white supervisory work force.

53. The statistical evidence shows that:

(a) In 1976, blacks represented 5.8% of 137 store promotions and 9.0% the store workforce. Sixty whites (93.8%) and four blacks were promoted to store management jobs (assistant produce manager, produce manager, assistant market manager, market manager, grocery manager, acting grocery manager, grocery manager trainee, relief grocery manager, deli manager, relief assistant manager, assistant manager, head cashier, assistant head cashier). (P.E. 1, 23). In non-management store jobs, there were 69 whites (94.5%) and four blacks (5.5%) promoted.

(b) In the warehouse, there were nine whites and two blacks promoted to leadman/foreman jobs in 1976. (P.E. 3). These 1976 promotions kept the official/managers jobs basically all white. In 1975, 94.6% of officials/managers were white and in 1976 it was 94.7%. (P.E. 5, p. 69).

(c) In 1975, at the stores, blacks represented 3.6% of 110 store promotions, and 8% of the store work force. Forty-four whites (100%) and no blacks were promoted into management jobs (assistant market manager, market manager, produce manager, assistant produce manager, relief produce manager, grocery manager, relief grocery manager, relief head cashier, assistant store manager, deli manager, assistant head cashier, head cashier, assistant manager, store manager, relief assistant manager, management trainee). (P.E. 23). Sixty-two whites (93.9%) and four blacks (6.1%) were promoted into non-management store jobs. (P.E. 1, 3, 30, 21, 23).

(d) A comparison of the white and black selection rates shows:

| Unit | Year | Total | | Pro | | | | B Rate |
| | | W | B | W | B | W Rate | B Rate | W Rate |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Warehouse/Store | 1976 | 1603 | 284 | 171 | 21 | 10.66% | 7.39% | 69.3% |
| Stores | 1975 | 1191 | 99 | 104 | 6 | 8.73% | 6.1% | 69.8% |
| Stores | 1976 | 1192 | 111 | 129 | 8 | 10.8% | 7.2% | 66.7% |

(P.E. 2, 5, 23).

(e) At the stores/warehouse in 1975, 70.5% of the whites ($^{124}/_{176}$) who changed job titles received pay increases, while the corresponding percentage for the blacks is 56.8% ($^{25}/_{44}$). (P.E. 3).

## VIII. OTHER FINDINGS

### Hiring

54. In reference to hiring, the evidence shows that:

(a)(1) In 1976, the store jobs of bagger, stock clerk, produce clerk, and deli bakery clerks accounted for 531 hires or 82.5% of all hires (531/644). (P.E. 2). In 1975, these same jobs accounted for 82.4% of all hires (540/655). (P.E. 2). In 1976, two persons, both white, were hired into managerial jobs (grocery manager, assistant market manager). This is 0.3% of the total hires. (P. E. 2). In 1975, one person (W) was hired into a management position (assistant market manager). This is 0.2% of the total hires. (P.E. 2).

(2) In 1976, in the warehouse jobs of picker, driver, stocker and forklift driver, there were 255 hires or 76.1% of all hires (255/335). (P. E. 2). In 1975, these same jobs accounted for 74.5% of all hires (143/192). (P. E. 2).

(b)(1) Defendant has no written job descriptions. The overwhelming majority of jobs at the warehouse (e.g. picker, driver, stocker, and forklift driver) and at the stores (e.g. bagger, cashier, stock clerk, produce clerk, deli bakery clerk) have skill requirements which are held by or readily available to the general public. See Finding 42, supra; P. E. 26–A.

(2) Defendant has no educational requirements for its jobs.

(3) Defendant did not present any evidence showing the degree of skill required in any job.

55. The appropriate labor markets show the following black availability. (P. E. 8).

(a) Mecklenburg County labor force:
1. 1973    21.2%B
2. 1976    21.8%B

(b) Charlotte Standard Metropolitan Statistical Area (SMSA) Experienced Civilian Labor Force:    1970    20.4%B

56. Harris-Teeter hired as follows:

| | | Total | W | B |
| --- | --- | --- | --- | --- |
| 1975 | Stores | 655 | 613 | 42 |
| | Warehouse | 192 | 122 | 70 |
| | Total | 847 | 735 | 112 |
| 1976 | Stores | 644 | 596 | 48 |
| | Warehouse | 335 | 267 | 68 |
| | Total | 979 | 863 | 116 |

57. The plaintiffs' statistical expert conducted a statistical analysis of the data set forth in P. E. 8. He used the "Z test for significance of difference between proportions" and a "T test." These standard tests are accepted by statisticians. The test results were:

(a) Hires in all Mecklenburg County facilities.

| Year | Labor Market | Test Results |
| --- | --- | --- |
| 1975 | Mecklenburg Labor Pool | 0.001 |
| 1976 | Charlotte SMSA Labor Pool | 0.001 |

The test results mean that there was one chance in one thousand that the lower percentages of black hires at Harris-Teeter could have occurred randomly (disassociated with race) when compared with the labor market availability of blacks.

(b) Hires at stores:

| Year | Labor Market | Test Results |
| --- | --- | --- |
| 1975 | Mecklenburg County Labor Pool | 0.001 |
| 1976 | Charlotte SMSA Labor Pool | 0.001 |

The test results mean that there was one chance in one thousand that the lower percentages of black hires at Harris-Teeter stores could have occurred randomly (disassociated with race) when compared to the labor market availability of blacks.

(c) Combined Hires 1974–1976:

| Unit of Hires | Labor Market | Test Results |
|---|---|---|
| All | Mecklenburg Labor Pool | 0.001 |
| | Charlotte SMSA Labor Pool | 0.001 |
| Stores | Mecklenburg Labor Pool | 0.001 |
| | Charlotte SMSA | 0.001 |

The test results mean that there was one chance in one thousand that the lower percentage of black hires at Harris-Teeter could have occurred randomly (disassociated with race) when compared to the labor market availability of blacks. All test results were statistically significant. (Tr. 652–658).

58. Utilizing the test set forth in Finding 48(e), *supra*, and the hiring data set forth in Finding 56, and the labor markets set forth in Finding 55, *supra*, the following results are obtained:

| YEAR | TOTAL HIRED | BLACK AVAILABILITY | EXPECTED NUMBER | OBSERVED NUMBER | STD. DEV. | NO. OF STD. DEV. FROM THE EXPECTED |
|---|---|---|---|---|---|---|
| 1975 | 847 | 21.2% (Co. Labor Force, 1973) | 179.56 | 112 | 11.895 | 5.680 |
| | | 20.4% (Charlotte SMSA Experienced Labor Force) | 172.8 | 112 | 11.728 | 5.184 |
| 1976 | 979 | 21.8% (Co. Labor Force, 1976) | 213.4 | 116 | 12.919 | 7.539 |
| | | 20.4 (Charlotte SMSA Labor Force) | 199.7 | 116 | 12.608 | 6.638 |

If one utilizes the same test and excludes persons *hired into* management or skilled jobs, the results are as follows:

| | | | | | | |
|---|---|---|---|---|---|---|
| 1975 | 838 | 20.4 (Charlotte SMSA) | 171 | 110 | 11.665 | 5.221 |
| | | 21.2 (Co., 1973) | 177.7 | 110 | 11.831 | 5.722 |
| 1976 | 947 | 20.4 (Charlotte SMSA) | 193.2 | 115 | 12.401 | 6.305 |
| | | 21.8 (Co., 1976) | 206.5 | 115 | 12.706 | 7.201 |

For the store hires in 1976, the excluded jobs are grocery manager, assistant market manager, produce manager trainee, meatcutter, grocery manager trainee, and deli manager trainee. This would make the hiring breakdown 583 whites and 48 blacks. In 1976, for warehouse hires, the excluded jobs would be mechanic III, refrigeration mechanic, forklift mechanic, electricians, and maintenance mechanic. This would make a hiring breakdown of 249 whites and 67 blacks. In 1975 at the stores the excluded jobs would be meatcutter and assistant market manager. This would make the breakdown 611 whites and 41 blacks. In 1975 at the warehouse the excluded jobs would be forklift mechanic, mechanics and leadman. This would make the breakdown 117 whites and 69 blacks. (P.E. 2).

*Decrease in Black Work Force; Increase in White Work Force*

59. There was a considerable decline in the number of black employees between 1974 and 1978. There was a considerable increase in the number of white employees.

(a)

| Year | W | B | Source |
|---|---|---|---|
| 1974 | 1546 | 527 | D.E. 5, 14, 15, 20, 25 |
| 1975 | 1507 | 321 | D.E. 4, 12, 13, 19, 24 |
| 1976 | 1887 | 309 | D.E. 3, 10, 11, 18, 23 |
| 1977 | 1872 | 267 | D.E. 2, 8, 9, 17, 22 |
| 1978 | 2372 | 322 | D.E. 1, 6, 7, 16, 21 |

(b) The differences between 1974 and 1978 are 826 additional whites and 205 fewer blacks. The black work force decreased

by 38.9% (205/527), while the white work force increased 53.4% (826/1546). The defendant did not offer any explanation as to why there was a large decrease in the black work force and a large increase in the white work force.

60. Employment practices by the defendant as a company, statistical evidence, and individual cases of discrimination support the findings of discrimination set forth in paragraphs 22–58.

61. Plaintiffs' attorneys have provided valuable services.

62. Dr. Michalowski is an expert in statistics, and performed valuable services.

63. The discrimination against Messrs. Porter, Lilly, Reed, Gregory, Gary, Mobley, McKinney, Torrence, Patterson, Jones, Sullivan, Bailey, and LeGrand was because of the employees' race or because they filed EEOC charges, or both.

64. Plaintiff Trial Exhibits 1–9, 11–25, 26 (except page 58), and 26A–34 are admitted into evidence and are specifically found to be accurate. (Tr. 692–94, 1254) (At trial, plaintiff's exhibits 31–34 were mistakenly referred to as plaintiff's exhibits 28–31.)

65. The claims of Fisher, Gatewood, Ervin, Carrothers, Anderson, Pharr, Goodwin, McManus, McMoore, Burch, and Reed (termination) were dismissed by Order (filed 6/7/81).

## CONCLUSIONS OF LAW

1. The Court has subject matter jurisdiction under 28 U.S.C. § 1343(4) and 42 U.S.C. §§ 2000e–5(f)(1) and 2000e–5(f)(3) (§§ 705(f)(1), 706(f)(3) of the Act.)

2. The defendant is an employer within the meaning of 42 U.S.C. § 2000e(b) and a person within the meaning of 42 U.S.C. § 1981.

3. All procedural requirements of Title VII have been met, 42 U.S.C. § 2000e–5(f)(1).

4. Intervenors Reed and Gatewood worked in a store, as did plaintiff Gregory. The remaining intervenors worked in the same warehouse as did plaintiff Lilly. Both

Lilly and Gregory filed timely charges with the Equal Employment Opportunity Commission (EEOC). The claims of the intervenors involved racial discrimination at Harris-Teeter's warehouse and stores. The claims of Lilly and Gregory involved racial discrimination by Harris-Teeter at the warehouse and stores. The motion was timely. The claims of the intervenors were identified in plaintiffs' answers to defendant's interrogatories prior to the motions to intervene. The fact that none of the intervenors (other than Gregory) has exhausted his administrative remedies does not prohibit intervention. Lilly exhausted his prejudicial administrative remedies. His amended charge alleged class discrimination in discharge and promotion (P.E. 17). The claims of each intervenor were within the scope of Lilly's charge. The intervention did not unduly delay or prejudice the adjudication of the rights of the parties. Federal Rules of Civil Procedure, Rule 23(d) contemplates intervention. See *Advisory Committee's Notes on Rule* 23(b)(2), 39 F.R.D. 69, 102. The intervenors alleged a general policy of discrimination in termination and promotion as did Lilly in his EEOC charge and judicial complaint. Within the discretion of the Court, the intervention of Reed, Mobley, Gary, Gregory, McKinney, Torrence, Patterson, Jones, Johnson, Sullivan, LeGrand, Bailey, McManus, Fisher, Hunt, McVay, Covington, Carrothers, Goodwin, Burch, and Gatewood is proper. See e.g. *United Airlines, Inc. v. McDonald*, 432 U.S. 385, 97 S.Ct. 2464, 53 L.Ed.2d 423 (1977); *Muskelly v. Warner & Swasey Co.*, 653 F.2d 112 (4th Cir. 1981); *Wheeler v. American Home Products*, 563 F.2d 1233 (5th Cir. 1977); and *Oatis v. Crown Zellerbach*, 398 F.2d 496 (5th Cir. 1968).

5. In reference to the claims of intervenors Reed, Mobley, Gary, McKinney, Torrence, Patterson, Jones, Johnson, Sullivan, LeGrand, and Bailey, the defendant has raised the defense of the Statute of Limitations.

(a) Those intervenors have stated claims under 42 U.S.C. § 1981. The Statute of Limitations for § 1981 is the most analo-

gous Statute of Limitations of the state where the deprivation occurred. In this state the most analogous Statute of Limitations is either N.C.G.S. §§ 1–52(1) or 1–52(2). See *Chisholm v. U. S. Postal Service,* 516 F.Supp. 810, 871 (W.D.N.C.1980) and *Pittman v. Anaconda Wire and Cable Co.,* 408 F.Supp. 286, 293 (E.D.N.C.1976). Each statute is for 3 years. The complaint in intervention was filed on 8/15/79. The claims of intervenors Reed, Mobley, McKinney, Torrence, Patterson, Jones, Johnson, Bailey, and LeGrand arose within 3 years of the filing of the complaint in intervention. They are therefore timely except for the positions noted below: James Mobley (Terry Givens' promotion of 6/7/76); Jerome Gary, Roy Torrence (promotion of Mitchell on June 16, 1975); Roosevelt Patterson (promotion of Terry Givens on 6/7/76; promotion of Neal Mitchell on 6/16/75); Curtis Jones (hire of James Lamb in 5/76); and, John LeGrand (Doug Dover's promotion of 1/26/76; Terry Given's promotion of 6/7/76).

■ (b) A class is limited to those persons who could have filed timely EEOC charges at the time the class representative filed his or her charge. *Wetzel v. Liberty Mutual Insurance Company,* 508 F.2d 239 (3rd Cir. 1975). The act of filing a class action Court complaint tolls the Statute of Limitations on the individual claims of members of the alleged class. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 176 n. 13, 94 S.Ct. 2140, 2152 n.13, 40 L.Ed.2d 732 (1974); *American Pipe & Construction Co. v. Utah,* 414 U.S. 538, 554, 94 S.Ct. 756, 766, 38 L.Ed.2d 713 (1974); *Parker v. Crown, Cork and Seal Company,* 677 F.2d 391 (4th Cir. 1982); and *Susman v. Lincoln American Corp.,* 587 F.2d 866, 869 (7th Cir. 1978) *cert. denied,* 445 U.S. 942, 100 S.Ct. 1336, 63 L.Ed.2d 775 (1980). In the context of 42 U.S.C. § 2000e *et seq.,* this means that the filing of a class action complaint tolls the Statute of Limitations for the claims of individual members of the class. The tolling date is 180 days prior to the filing of the class representative's EEOC charge. The earliest EEOC charge (Lilly) was filed on 1/20/75, and his judicial complaint was filed

on 6/18/76. The beginning date of the class is 7/24/74. All of the complaints of the intervenors are based upon actions which occurred after 7/24/74. They could have filed EEOC charges at the time Lilly did or thereafter. The claims of the intervenors are timely. See e.g. *Parker, supra,* and *Gill v. Monroe County Dept. of Social Services,* 79 F.R.D. 316, 331 (WDNY, 1978).

■ 6. By earlier orders of the Court, these proceedings were conditionally certified as class actions under Rule 23. Reviewing this issue at the close of the evidence, the Court is of the opinion that class certification should be modified and made permanent. The requirements of Rule 23(a) have been carefully applied in this action. The analysis has been rigorous. Because of the evidentiary record in this case, the careful application of the requirements of Rule 23(a) and the rigorous analysis the previously certified class has been modified. There has been no presumption that any of the requirements of Rule 23 have been met. Each requirement has been met because of the record present in this case. See *General Telephone Company of the Southwest v. Falcon,* —— U.S. ——, 102 S.Ct. 2364, 72 L.Ed.2d —— (6/14/82), and *Stastny v. Southern Bell Telephone and Telegraph Co.,* 628 F.2d 267 (4th Cir. 1980). Lilly and Gregory have filed timely charges and have exhausted the administrative procedures under Title VII. The plaintiffs have presented evidence which supports their claims that they were discriminatorily denied promotions and discharged. They have, therefore, been subjected to the same practices from which they seek relief on behalf of the class. *Chisholm v. United States Postal Service,* 665 F.2d 482 (4th Cir. 1981).

(a) During the time relevant to this proceeding, defendant employed approximately 200 black employees annually. More than 200 black employees each year, including in excess of 50 store employees, and 150 warehouse employees, have been affected or potentially affected by defendant's employment practices. The number of black em-

ployees affected is too numerous to make joinder of all class members practical.

(b) The claims of plaintiffs and the class present common questions of law and fact. The relief plaintiffs seek is also typical of the relief sought on behalf of the class. Plaintiffs have shown that over an extended period of time defendant has denied them equal promotional opportunities, and has discharged them discriminatorily. Defendant's promotion policy as well as the discharge procedure are applicable to all the stores and warehouse. Plaintiffs' evidence demonstrates that race has been the dominant factor which has influenced or determined defendant's personnel practices complained of. Plaintiffs seek relief from defendant's practices, as authorized by Title VII, for all black employees who have been adversely affected during the time relevant to this proceeding. The evidence at trial demonstrated by means of statistics, proof of specific, individual cases, and review of unfairly applied personnel practices that black employees have been victims of these discriminatory practices and that such practices have classwide scope and effect.

(c) This Court's inquiry with regard to typicality is governed by *Hill v. Western Electric*, 596 F.2d 99 (4th Cir. 1979). In reliance upon *East Texas Motor Freight v. Rodriguez*, 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977), the Fourth Circuit held that persons employed by the defendant cannot represent a class which includes applicants for initial employment. This case has one claimant who had a hiring claim. All persons certified as class representatives have been or are employed by Harris-Teeter. Applicants for initial employment are hereby excluded from the class definition.

(d) *Hill* makes it clear that the typicality requirement is met by plaintiffs who are seeking to challenge practices at the same facility. 596 F.2d at 102. This case meets the *Hill* test. Two class representatives who exhausted the EEOC process worked at the stores and the warehouse. The other class representatives worked at either the stores or the warehouse. All of the certified representatives have the same claims

as the class members (either promotion or discharge). Each store presents the same range of jobs and performs the same function retail sale of supermarket items. Nine of the stores were supervised by the same territorial manager. The warehouse functions were related to store activities. Employees were transferred and promoted among the various warehouse departments and between and among the warehouse and stores. Warehouse employees were offered positions in the stores. The stores and warehouse are all located within the County. Common features of the promotion and termination practices which adversely affected black employees were present at both the stores and warehouse. The overwhelming majority of jobs required skills which are held by or are readily available to the general public. The warehouse and stores draw basically from the same external labor market for their hires. See e.g. *Chisholm v. United States Postal Service*, supra, 665 F.2d 482; and *Patterson v. American Tobacco*, 535 F.2d 257 (4th Cir. 1976).

(e) The main office is different. None of the plaintiffs and intervenors worked at that office. The jobs at the main office were specialized management jobs. The main office is hereby excluded from the class definition.

(f) Finally, by their conduct in this case and by presenting solid evidence of discrimination, plaintiffs and their counsel have adequately represented the interests of the class. The plaintiffs do not have interests antagonistic to those of the class.

(g) Through the implementation of personnel practices which have limited the employment opportunities of plaintiffs and other black employees, defendant has pursued practices which have generally affected black employees in the same way, thereby making appropriate final injunctive relief. Additionally, the questions of law and fact common to the employees affected predominate over any questions affecting only individuals. A class action proceeding will avoid conflicting results, will expedite final resolution of the various claims and is supe-

rior and preferable to other remedies which may be available to plaintiffs and other black employees of defendants.

(h) These proceedings should, therefore, be certified as a class action under Rule 23(a) and (b)(2) with the class defined as Plaintiffs Lilly, Gregory, Reed, Mobley, Gary, McKinney, Torrence, Patterson, Jones, Johnson, Gatewood, Sullivan, Bailey, and LeGrand; and all blacks currently employed by Harris-Teeter at its warehouse and store numbers 1, 2, 5, 8, 9, 22, 39, 52, 55, 59, 62, 66, and 83 located in Mecklenburg County; and all blacks employed by Harris-Teeter (at said warehouse and stores) at any time since July 20, 1974, who are not currently employed, all of whom may have been or may be subjected to racial discrimination by Harris-Teeter in its employment policies and practices in reference to terminations and promotions. See *Chisholm v. United States Postal Service, supra; Wetzel v. Liberty Mutual Ins. Co.,* 508 F.2d 239 (3rd Cir. 1975); *EEOC v. Printing Industry of Metropolitan Washington,* 27 EPD paragraph 32221 (D.D.C.1981).

7. Plaintiffs may establish liability against an employer under Title VII by establishing that an employer has pursued or is presently pursuing policies and practices which limited the employment opportunities of black employees to a statistically significant degree. See e.g. *Hazelwood School District v. United States,* 433 U.S. 299, 97 S.Ct. 2376, 53 L.Ed.2d 768 (1977); *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *EEOC v. Radiator Specialty,* 610 F.2d 178 (4th Cir. 1979); *EEOC v. American National Bank,* 652 F.2d 1176 (4th Cir. 1981). To make such a showing, plaintiffs must demonstrate that through the use of identifiable employment criteria or procedures black employees have suffered disproportionately. The sample of employees affected must be otherwise eligible for the job positions or employment opportunities in question. Where statistics are used, the number of employees involved must be large enough for the Court to draw reliable conclusions and the disparate im-

pact of the practices must be statistically significant (two or more standard deviations if binomial analyses are used) so that the observed cannot reliably have occurred by chance. *Hazelwood, supra; American National Bank, supra.* If plaintiffs rely on difference in treatment, they must demonstrate by the preponderance of the evidence that black employees have been treated differently in employment opportunities because of race and that the employer has acted intentionally or purposefully. *Teamsters, supra.* Purpose or intent may be shown by circumstantial evidence which eliminates all legitimate, non-racial explanations for the employer's practices. *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 266–268, 97 S.Ct. 555, 563–65, 50 L.Ed.2d 450 (1977).

(a) Terminations (Findings 23, 47–50, *supra* ). The policy is unwritten except for rules of conduct. A violation of the rules may or may not result in discipline or discharge. The system varies from one supervisor to another. Whites who violated the rules were not terminated while blacks were. White employees violated a rule many times before receiving a warning. Such features, where a statistically significant imbalance in employment actions has been shown, are badges of discrimination that tend to corroborate the racial bias shown by the statistics. *E. E. O. C. v. American National Bank, supra,* 652 F.2d at 1198. The raw statistical evidence shows that: a much higher proportion of the black work force was subjected to involuntary terminations; between 1974–78, the black work force at Harris-Teeter *decreased* by 38.9% while the white work force *increased* by 53.4%; and, between 1974–78 blacks represented 28.1% of all involuntary terminations while representing a much smaller proportion of the work force. The statistical test results were that the actual number of blacks involuntarily terminated ranged from 4.09 to 10.149 deviations above the expected number of blacks. Those results rule out chance as a cause. *American National Bank, supra,* 652 F.2d at 1192. De-

fendant's only evidence was a summary of the numbers and reasons why persons were terminated. Plaintiffs' statistics alone support the conclusion that black employees as a class were discriminatorily discharged. When considered with the other evidence of record, that conclusion is inescapable. *American National Bank, supra; Chisholm v. United Postal Service, supra; Williams v. Trans-World Airlines,* 660 F.2d 1267 (8th Cir. 1981); *Flowers v. Crouch-Walker,* 552 F.2d 1277 (7th Cir. 1977); *Bolton v. Murray Envelope,* 493 F.2d 191 (5th Cir. 1974); *Edwards v. J. C. Penny,* 27 EPD paragraph 32356 (N.D.Ga.1981); *Bledsoe v. Wilker Brothers,* 24 EPD paragraph 31468 (W.D. Tenn.1980).

(b) Promotions (Findings 10–20, 24, 25–34, 51–57). There are no written job descriptions, no written system of promotion or promotion criteria, and no system of regular job performance evaluation. The promotion criteria (e.g. "attitude," "initiative," etc.) were vague and subjective. Supervisors were not furnished written instructions specifying qualifications necessary for promotion. The supervisor's recommendation was an important factor in the promotion process. There was no job posting until 1979. The current job posting is limited to the warehouse. The practice of the "same shift, same department" was applied unevenly. The only exceptions to it in the record are white persons. The overwhelmingly white management/supervisory work force of defendant is unfettered in its discretion to decide whom to promote and what factors to utilize in any promotion decision. Employees learned of vacancies by word of mouth, the appearance of a new employee, or current employee working a different job. There was no requirement that a person ask for a particular job in order to be considered. Refusals by blacks to take jobs on particular occasions were carefully remembered. They were never asked if they had changed their minds. Relevant job experiences of blacks was ignored by management. Relevant job experience of blacks not noted on the application forum was deemed not to exist; however, word of mouth experience of whites was remembered. These factors corroborate the racial bias shown by the statistics. *American National Bank,* 652 F.2d at 1198. The statistical evidence shows that: In 1975 and 1976 blacks represented a much lower percentage of the store promotions than their percentage in the store work force; in 1975–76 there were 104 whites and 4 blacks promoted to management jobs at the stores; and the black promotion rate was less than 70% of the white promotion rate. The instances of individual discrimination show the adverse effect of the defendant's promotion practices upon qualified blacks. The defendant's defenses to the individual claims showed disparate treatment (e.g. same shift/same department policy has only white exceptions; relevant prior experience of blacks either ignored or forgotten while that of whites carefully remembered). The defendant's statistical defense unnecessarily limited the available black pool. This defense ignored qualified blacks and the exclusion of blacks from many jobs (Tr. Asher 51–52; D. E. 26–35, 123–25; P. E. 1). The evidence is reflective of both disparate impact and disparate treatment. The plaintiffs have proved a pattern and practice of discrimination on the basis of race in promotions through the use of statistical evidence and individual instances of racial discrimination. The examination of the promotion practice reveals that it was applied to blacks in an adverse and inequitable manner. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396; *Griggs v. Duke Power,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158; *Chisholm, supra; American National Bank, supra,* 652 F.2d at 1197–1202; *Barnett v. W. T. Grant,* 518 F.2d 543 (4th Cir. 1975); and *Rock v. Norfolk and Western Railway,* 473 F.2d 1344 (4th Cir. 1973). See also 29 C.F.R. § 1607.4(d) and *Chisholm, supra,* 24 EPD paragraph 31326 at p. 18036 (W.D.N.C.1978).

(c) Hiring (Findings 42, 53–57). The hiring evidence, in conjunction with the promotion evidence, can be examined to determine whether discrimination is present. *Fisher v. Procter and Gamble,* 613

F.2d 527, 541 (5th Cir. 1980). The defendant has no written job descriptions. The evidence presented showed that the overwhelmingly majority of jobs had skills that are generally held by or readily available to the general public. The defendant never presented any evidence which justified its limitation of the available labor force to a special market. (D.E. 16–25). When, as a matter of law, there is a question as to whether a particular job or jobs have skills which justify the use of a special market, the defendant has the burden of presenting evidence of the skills which require limitation to a special market. *EEOC v. Radiator Specialty*, 610 F.2d 178, 185 (4th Cir. 1979). A statistical analysis of *all* hires shows that there was one chance in 1,000 that the lower percentages of black hires at Harris-Teeter could have occurred by chance. When the same statistics were tested by the binomial test, the results were that the actual number of black hires varied from 5 to 7 standard deviations below the expected number. After eliminating management and skilled jobs, the same results were obtained. These results remove chance as a cause. *American National Bank, supra*, 652 F.2d at 1192. The hiring evidence supports the findings and conclusion of a pattern and practice of discrimination on the basis of race in promotions. *Fisher, supra.*

8. Where, as here, plaintiffs have succeeded in establishing that an employer has discriminately denied black employees equal promotional opportunities or has discriminated against black employees in discharges, individual claims should be reviewed with this background. *Sledge v. J. P. Stevens & Co., Inc.*, 585 F.2d 625, 637–643 (4th Cir. 1978). See also *Teamsters, supra.* Each class member is entitled to a presumption of discrimination. The employer can overcome this presumption by demonstrating by a preponderance of the evidence that factors other than the condemned discrimination caused the challenged decision. See also, *American National Bank, supra* at 1201.

9. This Court has reviewed the individual claims under the more restrictive standards of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) as further amplified by *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). See also, *Teamsters, supra*, 431 U.S. 324, 358, n. 44, 97 S.Ct. 1843, 1866, n.44, 52 L.Ed.2d 396; *Brady v. Thurston Motor Lines*, 673 F.2d 1306 (4th Cir. 1982). Under this approach, individual claimants have the burden throughout the *liability* stage of establishing that they have suffered intentional discrimination. They may establish a *prima facie* case by showing that they: were qualified for promotion or transfer; a vacancy existed; they were not selected; and, a white employee was selected. They may also establish that they were treated differently by their employer in other employment opportunities than similarly situated white employees. If plaintiffs establish a *prima facie* case, the burden of producing *some evidence,* but *not the burden of persuasion*, shifts to defendant to offer some legitimate, non-racial explanation for its practices. The employer should produce sufficient evidence to permit the trier of facts to determine whether the proffered evidence, *if taken at face value*, explains its allegedly discriminatory action. If the employer offers a reason for the challenged action, plaintiffs must then show (with additional evidence) or demonstrate (based on evidence already admitted) that the employer's explanation is pretextual. The Court may then review all of the record evidence, with plaintiffs retaining the burden of persuasion, to determine whether unlawful discrimination has been established. *Teamsters, supra; Burdine, supra.*

10. The Court will now review the individual claims of plaintiffs, intervenors and class members who testified at trial under the above standards. All of the evidence bearing on each claim has been considered by the Court. The detailed examination included consideration of a *prima facie* case, articulation by defendant of a legitimate, non-discriminatory explanation and whether the explanation was pretextual. Deci-

sions of credibility have entered into the examination. Where the Court concluded that defendant offered proof of a legitimate, non-discriminatory explanation, that conclusion has been based upon admissible evidence with no burden of persuasion being placed on defendant. Where the Court concluded that the defendant's explanation was pretextual, it did so by examining all of the evidence with the plaintiffs bearing the burden of proof and persuasion throughout. Where liability was established, the Court also found proof of discriminatory purpose or intent in defendant's actions. Each prevailing claimant is entitled to appropriate relief in Stage 2 proceedings.

(a) *Edward Porter* established a *prima facie* case by showing that he applied for the position of truck driver, that he was qualified, that vacancies existed, that he was not hired, and that whites were hired. Defendant stated there was no vacancy. *Standing alone*, this evidence constituted a legitimate, non-discriminatory reason. Considering all of the evidence, defendant's reason is pretextual. Nine whites were hired within 120 days of Porter's application. One white was hired nine months after he applied. Porter was not hired because of his race.

(b) *Philip Reed* established a *prima facie* case when he showed that he applied for the position of produce manager twice, that he was qualified, that vacancies existed, and that less qualified whites were selected. Defendant's stated reasons were that the selectees were more qualified and that there was no vacancy. These reasons, *standing alone*, are legitimate, non-discriminatory reasons. Considering all of the evidence, defendant's reasons are pretextual. There were vacancies. Reed had more retail grocery management experience and was more qualified than the promotees. Harris-Teeter was aware of this experience but ignored it, just as it did with other black employees. See Finding 19. Reed was never considered for either position. The statistics show that 104 whites and 4 blacks were promoted to store management positions in 1975–76. Reed was affected by the discriminatory nature of the promotion

system. Reed was denied the promotions received by Allen and Wilson because of his race.

(c) *Paul Lilly* complained about racial discrimination at Harris-Teeter on 1/8/75, and was discharged on 1/10/75. He had performed his job adequately. Lilly has established a *prima facie* case. Harris-Teeter stated that it terminated Lilly because of errors. This reason, *standing alone*, constitutes a legitimate, non-discriminatory reason. Considering all of the evidence, defendant's reason is pretextual. The Court has made credibility decisions in favor of Lilly. Lilly was assigned beef-counting duties as part of inventory control; subsequent thereto there was a noticeable improvement. Counting errors had been made at the stores. Watson never checked to see if the errors allegedly made by Lilly had been made at the stores. Watson, who fired Lilly, used racial terms which are indicative of bias. See *Murry v. American Standard*, 373 F.Supp. 716 (E.D.La.1973) aff'd 488 F.2d 529 (5th Cir. 1973). Statistical evidence shows that blacks were involuntarily terminated at a significantly higher rate than their presence in the Harris-Teeter work force. The record shows differential treatment. See Findings 48–50. In fact one white with a very recent warning covering several acts of tardiness was promoted. Lilly was terminated because of his race and his opposition to practices made illegal by Title VII. See *Williams v. Trans-World Airlines, supra; Armstrong v. Index Journal Company*, 647 F.2d 441, (4th Cir. 1981); *Bolton v. Murray Envelope, supra; Brown v. Rollins*, 397 F.Supp. 571 (W.D.N.C.1974).

(d) *Richard Gregory* has proved a *prima facie* case of discriminatory demotion in that he was in a supervisory position, but he was involuntarily removed from said job, and he was replaced by a white employee. *Jones v. Trailways*, 477 F.Supp. 642, 645 (D.D.C.1979). Defendant stated it demoted Gregory because of his poor job performance. Standing alone, this articulates a legitimate, non-discriminatory reason. Considering all the evidence, said reason is pre-

textual. The Court resolved issues of credibility in favor of Gregory. Gregory is a credible witness. Gregory's work performance was praised by his subordinates and superiors. His attempt to terminate a white employee who called him a nigger was overruled. As a grocery manager, Gregory had to stock aisles himself while his white replacement did not. Gregory's demotion was decided by, and carried out in front of, the white territorial supervisor. There are very few blacks in store management positions. After Gregory was demoted, he was transferred to another store where he was harassed in various ways. Gregory, after filing his EEOC charge on 1/25/75, resigned in 5/75 because of the harassment and demotion. The conditions and treatment were intolerable and illegal. This justified Gregory's resignation. See *Calcote v. Texas Educational Foundation*, 578 F.2d 95 (5th Cir. 1978). Gregory was demoted because of his race and was constructively discharged because of his opposition to practices made illegal by Title VII.

(e) *James Mobley* has proved a *prima facie* case in that he was qualified for promotion, there were vacancies, he was not promoted, and whites were promoted. See e.g. *Higgins v. State of Okla. Ex. Rel. Okl. Emp. Sec.*, 642 F.2d 1199, 1201 (10th Cir. 1981). Harris-Teeter stated that the promotees were more qualified, Mobley was on strike when Allison was promoted, and Mobley was in a different department/shift. *Standing alone*, each reason is legitimate and non-discriminatory. Considering all of the evidence, said reasons are pretextual. Mobley was more qualified than the promotees because of his job experience, including "fill-in" leadman duties and performance. He was never considered for the Allison and Givens leadman openings. Allison was promoted some 8 weeks *after* Mobley informed the company that he was available for work. The same shift/same department defense for not promoting Mobley to the "defacto leadman" position of Jeff Fowlkes is invalid because of the way the practice was applied, and the adverse impact of said application upon blacks. See Finding 16. Finally, this conclusion is supported by the nature of the promotion system at Harris-Teeter and its adverse impact upon blacks. Mobley was denied promotions received by Givens, Allison, and Fowlkes because of his race.

(f) *Jerome Gary* has proved a *prima facie* case by showing that he was neither promoted nor transferred; he sought the positions; there were vacancies; he was qualified; and, whites received said positions. Harris-Teeter's reasons for neither promoting Gary (not qualified) nor transferring (never asked) standing alone, are legitimate, non-discriminatory. Considering all of the evidence, said reasons are pretextual. The Court resolved the credibility issue of whether Gary asked for the sitdown lift in favor of Gary. In reference to the mechanic's position, Gary was more qualified than the selectees because of his education and job training. The statistical evidence in Finding 26 also supports this conclusion. Finally, this conclusion is supported by the nature of the promotion system at Harris-Teeter and its adverse impact upon blacks. Gary was denied a transfer to the sitdown lift and a promotion to mechanic because of his race.

(g) *Christopher McKinney* has proved a *prima facie* case in that he was qualified for a promotion, there were vacancies, he was not promoted, he expressed an interest in promotion, and whites were promoted. Harris-Teeter stated that it did not promote McKinney because he was not qualified, and he was on strike when the positions were filled. *Standing alone*, each reason is legitimate and non-discriminatory. Considering all the evidence, said reasons are pretextual. A Harris-Teeter witness testified that McKinney was not qualified because of his poor work record and that persons received warnings when they had a poor work record. McKinney did not have any warnings. McKinney was more qualified than either promotee because of his greater departmental and supervisory experience. McKinney informed Harris-Teeter of his availability for employment before either position was filled. McKinney worked in the same department and on the

same shift as each of the openings. Each promotee crossed either a departmental or shift line to receive the promotion. This violated the same shift/department rule. Finally, this conclusion is supported by the nature of the promotion system and its adverse impact on blacks. McKinney was denied the promotions received by Fowlkes and Weaver because of his race.

(h) *Roy Torrence* has proven a *prima facie* case in that he was qualified for promotion, he expressed interest in promotion, he was not promoted, there were vacancies, and whites were promoted. Harris-Teeter stated that it did not promote Torrence because he did not ask for a position, and he was a poor employee. *Standing alone*, each reason is legitimate and non-discriminatory. Considering all of the evidence, said reasons are pretextual. Torrence asked for a promotion. He was told he would never be promoted. Torrence was rated as an excellent employee. He had prior supervisory experience. He was never considered for the Mitchell position. He was more qualified than either of the promotees (Mitchell, Hanson). He trained Mitchell. The criteria utilized in the Hanson promotion were subjective. Finally, the conclusion is supported by the nature of the promotion system and its adverse impact upon blacks. Torrence was denied promotion to the positions received by Mitchell and Hanson because of his race.

(i) *Roosevelt Patterson* has established a *prima facie* case in that he was qualified for various promotions, he was not promoted, he asked to be promoted, there were vacancies, and whites were promoted. Harris-Teeter stated that it did not promote Patterson because he left a position, he was not in the same department or on the same shift as the openings, he was not qualified, and he was on strike when the positions were filled. *Standing alone*, each reason is legitimate and non-discriminatory. Considering all of the evidence, each reason is pretextual. Patterson was more qualified than the promotees. Patterson left the receiver's job because he was denied assistance. The record evidence shows that generally 2 whites performed this job and Pat-

terson performed it alone. He was never considered for any of the promotions. The same shift/same department rule is pretextual. See Finding 16, *supra.* Patterson was qualified for said positions because of his experience and performance. The positions were filled either before Patterson went on strike or after he notified the employer he was available for work. Finally, the nature of the promotion system and its impact upon blacks supports this conclusion. Patterson was denied the positions listed in Finding 29 because of his race.

(j) *Curtis Jones* established a *prima facie* case in that he asked for the position of rail unloader twice, he was qualified, he did not receive said position, there were vacancies, and whites were hired. Harris-Teeter stated that it did not promote Jones because of his back problem. Said reason, *standing alone*, is legitimate and non-discriminatory. Considering all of the evidence, the reason is pretextual. His back problems were minor. The supervisor never asked him about the problem. He was transferred to the salvage dock where the items he moved were similar in size to those moved by a rail unloader. In 1976 Harris-Teeter hired seven whites and no blacks in loader/unloader positions. Jones was more qualified than the hirees. Finally, this conclusion is supported by the nature of the promotion system and its adverse impact on blacks. Jones was denied the rail unloader positions because of his race.

(k) *John Thomas Johnson*—Johnson was employed in February of 1975 as a picker and lift operator in the meat department and later in the produce department. He was qualified and available for the lead job and for the foreman job to which Jeff Fowlkes was promoted. Fowlkes was slotted into the leadman's job in October of 1976, and received the actual job title in November 1976. Johnson's complaint as to Fowlkes (and as to David Allison and Clyde Kiker) relates to promotions which occurred in April, 1977 (Fowlkes); May, 1977 (Allison); and August, 1977 (Kiker). Although Johnson was available and qualified from the time he abandoned the strike in Febru-

ary of 1977, he did in fact turn down a night job at $4.80 so that he could stay in a day job at $3.90 and look after his children. (His actual testimony on this issue was evasive, and it was only after some prodding from the court that he ever gave a clear answer about the "family reasons" which moved him to reject the higher paying job). Defendant says that his turning down the night shift work was the reason he was not considered for promotion. I am not sure that I ought to take that reason at face value, but I am unable to conclude that it was solely pretext. Relief will not be ordered for John Thomas Johnson.

(*l*) *Frank Sullivan* proved a *prima facie* case by showing that he was qualified for various promotions, he was not promoted, there were vacancies, and whites were promoted. Harris-Teeter stated that it did not promote Sullivan because he left the foreman trainee program, was less qualified than the promotees, and was on a different shift than a vacancy. Each reason, *standing alone*, is legitimate and non-discriminatory. Considering all of the evidence, they are pretextual. Sullivan was more qualified than the promotees because of his experience, including that of leadman. His leaving the foreman training program as a defense is unworthy of credence. The same shift/department reason lacks credence. See Finding 16. Finally, the nature of the promotion system and its adverse impact on blacks supports this conclusion. Sullivan was denied the promotions received by Kiker and Hamilton because of his race.

(m) *Kenneth Bailey* established a *prima facie* case in that he was qualified for promotions, there were vacancies, he was not promoted, and whites were promoted. Harris-Teeter stated that Bailey was not promoted because he was not as well qualified as the promotees. *Standing alone*, this reason is legitimate and non-discriminatory. Considering all of the evidence, said reason is pretextual. Bailey was more qualified than each promotee because he had greater departmental experience and performed a broader range of duties. Finally, this conclusion is supported by the nature of the promotion system and its adverse impact on

blacks. Bailey was denied the positions received by McClain and Carpenter because of his race.

(n) *John LeGrand* established a *prima facie* case by showing that he was qualified for several promotions, there were vacancies, he was not promoted, and whites were promoted. Harris-Teeter stated that it did not promote LeGrand because he was on strike when Fowlkes was promoted; in a different department or shift than the vacancy, and less qualified than the promotees. *Standing alone*, each reason is legitimate and non-discriminatory. Considering all of the evidence, said reasons are pretextual. LeGrand was more qualified than the promotees because of his prior experience. He had more loading experience than Fowlkes. Fowlkes assumed the *defacto* leadman duties before the strike. The same shift/department reason is invalid for the reasons set forth in Finding 16. Finally, this conclusion is supported by the nature of the promotion system and its adverse impact on blacks. LeGrand was denied the promotions received by Fowlkes, Dover, and Givens because of his race.

(*o*) Harris-Teeter advanced its "same shift/same department" policy as a reason for failing to promote various claimants. Said reason is pretextual. See Finding 16. It is unworthy of credence. The policy was applied only to black employees. The testimony as to its scope was conflicting. The only persons denied promotions because of its application were blacks. This evidence showed that the practice had an adverse impact upon blacks and resulted in differential treatment for black employees (e.g. blacks could not cross shift/departmental lines, although whites did).

(p) The employer cannot be required to show that the selectee was more qualified than the claimant. *Burdine, supra.* However, when the employer chooses as its defense the allegedly superior qualifications of the selectee, then that evidence should be subjected to the same treatment as any other evidence when all of the evidence is examined to see if pretext is present. Har-

ris-Teeter utilized the qualifications of various selectees as a defense. That reason is pretextual because many of the comparisons involved claimants who were never considered at the time of the promotion. The "comparisons" were prepared solely for litigation and were retrospective in nature. The comparisons and the witnesses espousing them were not credible. Harris-Teeter did not regularly evaluate the job performance of its employees. The criteria utilized in employment decisions were unwritten and subjective. The claimants were more qualified when a credible comparison is made.

11. The defendant has intentionally discriminated against each of the prevailing plaintiffs because of his race in violation of 42 U.S.C. §§ 1981 and 2000e *et seq.* The defendant discriminated against the class on the basis of race in promotions and discharges between 7/24/74, and 2/20/80, in violation of 42 U.S.C. § 2000e *et seq.* Having found that some of the plaintiffs and class members suffered from defendant's unlawful, racially discriminatory employment practices, the Court must now devise appropriate remedies. The remedies should, so far as possible, place the plaintiffs and class members in the positions they would have occupied but for defendant's discriminatory practices. The relief should include appropriate injunctive relief and back pay. See *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 421, 422, 5 S.Ct. 2362, 2373, 2374, 45 L.Ed.2d 280 (1975); *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 763, 771, 96 S.Ct. 1251, 1263, 1267, 47 L.Ed.2d 444 (1976); *Chisholm v. United States Postal Service, supra.*

12. Plaintiffs Porter, Reed, Lilly, Gregory, Mobley, Gary, McKinney, Torrence, Patterson, Jones, Sullivan, Bailey and LeGrand have sustained losses of pay as a result of defendant's practices. They are entitled to injunctive relief and back pay. The Court concludes there is no equitable or other basis for denying such relief. Because appropriate vacancies may not be readily available, the plaintiffs (except Patterson, Gary, and Reed) and other class members may also be entitled to front pay—future pay at the rate of the positions they were wrongfully denied—until they are placed in a job of equal or higher pay. *Patterson v. American Tobacco Co.,* 535 F.2d 257, 269 (4th Cir. 1976), *cert. den.* 429 U.S. 920, 97 S.Ct. 314, 50 L.Ed.2d 286 (1977); *James v. Stockham Valves & Fitting Co.,* 559 F.2d 310, 356–358 (5th Cir. 1977), *cert. den.* 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1978); *White v. Carolina Paperboard Co.,* 564 F.2d 1073, 1091 (4th Cir. 1977). Defendant should be enjoined to reinstate or place these plaintiffs (except for Reed, Patterson, and Gary) and class members in the job positions they would now occupy but for the unlawful practices as found herein.

Plaintiffs and the class are also entitled to an injunction prohibiting defendant from discriminating against black employees in promotion and discharge. *Franks v. Bowman Transportation Co., supra.*

Additionally, class members who have suffered from the above practices are entitled to be placed in their rightful job positions, including reinstatement where appropriate, at the first vacancy. *Franks, supra.* "Bumping" or displacement of incumbent employees will not be ordered. *Patterson, supra; Sledge v. J. P. Stevens & Co., Inc., supra.* Rather, class members will be awarded front pay until vacancies occur and they can take their rightful positions. *Creswell v. Western Airlines, Inc.,* 514 F.Supp. 384, 394 (C.D.Cal.1981).

13. Pursuant to Rule 53, FRCP, the Court will appoint a Special Master to receive evidence from the parties and to make recommendations regarding the relief that should be awarded with respect to the individual claims of plaintiffs and class members. The Master need not consider the entitlement of Porter, Lilly, Gregory, Mobley, Gary, McKinney, Reed, Torrence, Patterson, Jones, Johnson, Sullivan, Bailey, and LeGrand to relief. Rather, the Master will accept the determinations that they have or have not been discriminated against in the manner indicated and will receive evidence *and make recommendations only with re-*

spect to the relief that should be awarded. With respect to other class members, the Master will receive evidence and make recommendations on their entitlement to relief as well as the relief that should be awarded. Class members are presumptively entitled to relief. They need only demonstrate that they are members of the class who sought promotion or were discriminately discharged and to provide information regarding their loss of earnings. *Teamsters, supra; Sledge, supra.* Defendant then has the burden of demonstrating by the preponderance of the evidence "that factors other than the condemned discrimination caused the decisions" of which the class members complain. *Sledge, supra* at 637.

14. Interest on back pay should be awarded. *Brown v. Coleman-Cocker*, 16 F.E.P. 1046, 1051 (W.D.N.C.1975). This interest should be awarded at the "adjusted prime rate" used by the IRS in cases of income tax refunds or penalties. See *EEOC v. Pacific Press Publishing Assn.*, 482 F.Supp. 1291, 1319–1320 (N.D.Cal.1979). This interest shall be compounded monthly.

15. Plaintiffs are also entitled to appropriate injunctive relief and reporting provisions to insure the discriminatory practices found herein do not recur. See *United States v. County of Fairfax*, 629 F.2d 932, 942 (4th Cir. 1980).

16. Plaintiffs are the prevailing parties and are entitled to their legal costs, reasonable expenses, attorneys' fees, and expert witnesses fees. 42 U.S.C. §§ 2000e–5(k) and 1988.

## JUDGMENT

This matter having come on for trial before the Court sitting without a jury and the issues having been duly tried and Findings of Fact and Conclusions of Law having been entered, IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

1. This proceeding is certified as a class action under Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure. The class is defined as:

Plaintiffs Lilly, Gregory, Reed, Mobley, Gary, McKinney, Torrence, Patterson, Jones, Johnson, Gatewood, Sullivan, Bailey and LeGrand; and all blacks currently employed by Harris-Teeter at its warehouse and store numbers 1, 2, 5, 8, 9, 22, 39, 52, 53, 55, 59, 62, 66, and 83, located in Mecklenburg County; and all blacks employed by Harris-Teeter at (at said warehouse and stores) any time since July 20, 1974 who are not currently employed, all of whom may have been or may be subjected to racial discrimination by Harris-Teeter in its employment policies and practices in reference to terminations and promotions.

The Court is entering with this Judgment a separate Order of *Reference to a Special Master*, which requires that appropriate notice be served on all class members.

2. Within ten (10) days from the date of this Judgment, the defendant is directed to post a copy of this Judgment on each bulletin board or other public place at each store and the warehouse in Mecklenburg County. The Judgment shall remain posted for sixty (60) days. The defendant shall certify to the Court within fifteen (15) days following the last date of publication that it has complied with this provision of the Judgment.

3. The defendant, Harris-Teeter Supermarkets, and all persons in active concert or participation with it are permanently enjoined and restrained from discriminating against the plaintiffs and members of their class as herein described on the basis of their race in promotion and discharge.

4. The defendants shall, within ten (10) days from the date of this Judgment or as soon as vacancies develop in appropriate job positions, reinstate or offer reinstatement, promotion or employment to the following plaintiffs:

Edward Porter
Paul Lilly
Richard Gregory
James Mobley
Christopher McKinney
Roy Torrence
Curtis Jones
Frank Sullivan

Kenneth Bailey

John LeGrand

Lilly is to be reinstated in the warehouse in the position or equivalent thereto, he had when he was terminated. Gregory is to be reinstated as a grocery manager or an equivalent position at a store located in Mecklenburg County. Mobley, McKinney, Torrence, Jones, Sullivan, LeGrand, and Bailey shall be promoted or offered promotions to the job positions they requested or to job positions to which they would now be assigned had they been promoted to the job positions the Court has found they were discriminatorily denied. Porter shall be offered employment as a truck driver. If the parties are unable to agree within thirty (30) days from the date of this Judgment on the job positions which the above plaintiffs should be offered or to which they should be promoted or assigned, this issue shall be referred for appropriate recommendations to the Special Master to be appointed by separate order.

5. The defendants shall pay back pay to plaintiffs Porter, Lilly, Reed, Gregory, Mobley, McKinney, Gary, Torrence, Patterson, Jones, Sullivan, Bailey, and LeGrand for any loss of pay they have sustained because of defendant's employment practices found herein to have been unlawful. Their loss of pay shall be based on the differences in their earnings from the dates of defendant's discriminatory practices until these plaintiffs have been reinstated, offered employment or promotion or assigned to job positions as herein provided. The amounts awarded shall represent the difference between what they would have earned had they not been discriminated against and what they have earned or should have earned through reasonable diligence. Except for Reed, Gary, and Patterson, who are no longer employed or available for employment by defendant, they shall also be awarded front pay until they have been placed in the job positions as directed herein. The amount of back or front pay to be awarded to these plaintiffs and class members shall be referred to the Special Master for recommendations.

6. Other members of the class, who are found by the Special Master to have been discriminatorily denied promotions or discharged, are also entitled to relief. They shall be reinstated in employment, promoted or transferred or employed where appropriate, and assigned to the job positions they would now occupy but for defendant's discrimination. They shall be awarded any loss of earnings they suffered as a result of defendant's racially discriminatory practices. The issues regarding the appropriate relief to be awarded to class members shall also be referred to the Special Master.

7. In proceedings before the Master, class members are entitled to a rebuttable presumption of liability based on their membership in the class. They may be awarded back pay from January 29, 1973, until they have been placed in the job positions they would now occupy had they not been subjected to defendant's racially discriminatory employment practices. The Special Master shall receive evidence from the interested parties, and based on the instructions in the separate order of reference, shall make proposed findings and recommendations with respect to any injunctive relief and the amount of back pay, together with adjustments in fringe benefits and interests each class member shall receive. The Master shall receive evidence and make recommendations regarding any front pay that should be awarded to class members.

8. Plaintiffs and members of the class are awarded adjustments in fringe benefits to reflect what the fringe benefits would have been in the absence of defendant's discriminatory practices. They shall also be awarded interest from the date of the discriminatory acts of the defendant calculated at the "adjusted prime rate" used by the Internal Revenue Service in cases of income tax refunds or penalties compounded monthly. The Master shall receive evidence from the interested parties, and based on the Court's instructions, shall make proposed findings and recommendations with respect to any adjustments in fringe benefits and the interest that should be awarded to plaintiffs and individual class members.

9. Within six (6) months from the date of this Judgment, defendant shall also take the following steps to eliminate remaining effects of their discriminatory practices:

Defendants shall:

(a) Post notices of all non-management openings at the stores and warehouse as well as openings in entry level management, professional, and supervisory positions. Employees are to be given three business days to bid on such vacancies. The notice must contain a brief description of the job, duties of the job, pay rate, and the name of the person to whom the employee is to submit his or her bid. The defendant is to maintain a list of employees who submit bids. This list is to be used as a source of filling future vacancies.

(b) Canvass the class members herein described and determine if they are interested in and are qualified for professional, technical, para-professional, skilled management, and supervisory job positions. This canvassing is only to use license and registration requirements, length of service, job performance and other job related criteria to determine if black employees are qualified. A list of names of those qualified shall be maintained and updated once every six months during the period the Court retains jurisdiction of this action. Interested class members who are not qualified for job positions in which they express an interest shall be informed in writing and shall be advised what they need to do in order to qualify.

(c) Establish job descriptions for all store and warehouse positions and establish objective, job related criteria for the selection of candidates for the positions.

(d) Establish job related criteria for the evaluation of job performances of all non-management employees at the stores and warehouse.

(e) Do not limit the consideration of warehouse promotion candidates to the employees on the same shift and in the same department where the vacancy is.

(f) Systematically record the job experience of all employees at the stores and warehouse.

10. Within six (6) months from the date of this Judgment, defendant shall provide the Court and plaintiffs' counsel with the following reports:

(a) the number of white and black employees assigned to each job and department of each store and the warehouse;

(b) the name of each class member who has been promoted or transferred since the date of this Judgment, the job position and rate of pay of the position to which the class member was transferred and his or her previous job position and rate of pay;

(c) the name of each class member whose request for promotion or transfer was denied and the reason or reasons for the denial;

(d) the name of each class member who has been involuntarily discharged since the date of this Judgment, the date of the discharge and the reason or reasons therefor (Defendant shall retain records of each class member who has been involuntarily discharged.);

(e) the name of each class member who has expressed an interest in job positions listed in paragraph 9 above, the job position requested and who has been included in the list of employees who are to be considered for future vacancies;

(f) the name of each class member who has expressed an interest in the job positions listed in paragraph 9 who has been determined by defendant to be unqualified and the reason or reasons for the determination.

Defendant shall provide the Court and plaintiffs' counsel with additional reports covering the above subjects every twelve (12) months thereafter during the Court's retention of jurisdiction of this action.

11. Defendant shall file a report with the Court within forty-five (45) days from the date of this Judgment, and shall serve copies of same on plaintiffs' counsel, certifying defendant's compliance with paragraph 4 of this Judgment and shall indicate the job positions offered to or to which the plaintiffs and class members listed in paragraph 4 have been assigned or promoted, together with the date of the offer or assignment. If a plaintiff or class member rejects the offer, defendants shall indicate the date of the rejection. .

12. Defendant shall designate an individual who will be responsible for preparing and submitting the reports provided for in this Judgment and for insuring compliance by defendants with all provisions herein. The name, job title, and address of the person designated shall be provided to the Court and as counsel within thirty (30) days from the date of this Judgment.

13. Plaintiffs are the prevailing parties in this action. The defendant shall pay plaintiffs' reasonable attorney fees, costs and expenses, including expert witness and consultation fees, paralegal time and unusual clerical time for all work performed in this proceeding until the date of this Judgment in accordance with the accompanying Memorandum of Decision as to Fees.

14. Plaintiffs' counsel shall also receive reasonable attorney fees, costs, and expenses, including paralegal time and other proper expenses, for all future work done on behalf of the plaintiffs and class members for all proceedings before the Special Master and for work done in the implementation of this Judgment, including fees and expenses for monitoring and examining the various reports required, in answering questions of class members and in investigating any alleged violations of this Judgment.

15. The following 42 U.S.C. § 1981 claims are dismissed because of the Statute of Limitations defense:

| CLAIMANT | POSITIONS CLAIMED |
| --- | --- |
| James Mobley | Terry Givens |
| Jerome Gary | N. Mitchell |
| Roy Torrence | N. Mitchell |

| CLAIMANT | POSITIONS CLAIMED |
| --- | --- |
| Roosevelt Patterson | T. Givens |
| Roosevelt Patterson | N. Mitchell |
| Curtis Jones | J. Lamb |
| John LeGrand | D. Dover |
| John LeGrand | T. Givens |

16. The claims of Hazel Fisher, Shirley Gatewood, Mack Ervin, William Carrothers, Barbara Anderson, Austin Pharr, Trevesant Goodwin, Woodrow McManus, Therrell McMoore, Richard Burch, and Philip Reed (terminated) have been previously dismissed with prejudice by the Order filed June 7, 1981.

17. The claim of Willie Covington was dismissed, with prejudice, at trial, on defendant's motion. He did not testify at trial.

18. The claim of John Johnson is dismissed with prejudice by the Amended Memorandum of Decision filed June 25, 1982.

19. The Court will retain jurisdiction of the action for three (3) years from the entry of this Judgment. The status of the action will be reviewed at that time and the action will be dismissed unless the Court finds it necessary to retain jurisdiction for further orders.

## ORDER ON REFERENCE TO A MASTER

The Court hereby refers this action to a Master, designated herein, for hearings, findings and recommendations concerning monetary relief to be awarded Edward Porter, Philip Reed, Paul Lilly, Richard Gregory, James Mobley, Christopher McKinney, Jerome Gary, Roy Torrence, Roosevelt Patterson, Curtis Jones, Frank Sullivan, Kenneth Bailey, John LeGrand, and appropriate injunctive and monetary relief, if any, to class members who file timely claims. This order is entered pursuant to the Findings of Fact, Conclusions of Law, and Judgment previously entered in this action.

1. Pursuant to Rule 53 of the Federal Rules of Civil Procedure, _____, of Charlotte, North Carolina, is hereby appointed as Master to make findings and recommendations for the appropriate relief

to be awarded to plaintiffs and to class members who file claims.

2. The Master shall expeditiously schedule discovery, if any is needed, and conduct hearings in order to make recommendations as provided herein. The Master, in consultation with counsel for the parties, shall develop a discovery schedule and shall set the dates, times and locations of the hearings to be held before the Master.

3. Counsel for the parties shall be allowed to conduct discovery as provided by Rules 26–37 of the Federal Rules of Civil Procedure in order to prepare for the hearings before the Master. Within thirty (30) days from the date all individual claims are filed, the Master shall hold a conference with counsel for the parties and schedule the time for completion of discovery and for the determination of all discovery motions. The Master shall also schedule at the earliest convenient time the dates and times for the hearings.

4. Within 60 days from the date of this Order, the defendant, Harris-Teeter Supermarket, Inc., shall mail, by certified mail, a copy of the NOTICE TO CLASS MEMBERS (herein "Notice") to the last known addresses of the plaintiffs and to all class members and shall post a copy of the Notice on each bulletin board or other public place at each store and the warehouse in Mecklenburg County for sixty (60) days.

5. The defendant shall also cause a copy of the Notice to be published once, no later than 60 days from the date of this Order, in the *Charlotte Observer* and the *Charlotte Post*.

6. Counsel for the defendant shall within ten (10) days following the mailing provide counsel for the plaintiffs and the clerk with a list of the names and addresses of all persons to whom copies of the Notice have been mailed and shall keep plaintiffs' counsel advised of all undelivered mailings.

7. The Master will receive evidence and make findings with respect to the claims of each individual named and each class member filing a claim with respect to any alleged discrimination in promotion or involuntary termination at any time from July 24, 1974 to February 21, 1980. The Master shall make specific findings and recommendations with respect to each claim and shall also recommend appropriate relief.

8. In order to aid the Master in his determination, counsel for the plaintiffs shall file with the Master a statement of claim on behalf of each individual and class member, indicating the specific act(s) of discrimination, the date of the discriminatory act and the earnings of the class member or individual from the date of the discriminatory act. The statement of claim shall be filed within sixty (60) days from the date of the completion of discovery. Counsel for defendant shall respond to each statement of individual claims within thirty (30) days after receipt of plaintiffs' statements. The parties shall meet to agree on the issues with respect to each claim. If no agreement is reached, each party shall file its statement of issues for each claimant.

9. Promotions as used herein shall include the movement or reassignment of an individual from a lower pay grade to a higher pay grade.

10. Vacancies shall include the filling of job positions by new employees, the hiring or assignment of incumbent employees to new positions within the stores and warehouse located in Mecklenburg County.

11. The Court has previously determined that Porter, Reed, Lilly, Gregory, Mobley, Gary, McKinney, Torrence, Patterson, Jones, Sullivan, Bailey, and LeGrand were discriminated against and denied employment or promotions or were discharged unlawfully. With respect to these individuals the Master shall receive evidence and make findings and recommendations regarding their loss of pay and fringe benefits. With respect to other class members, the Master, after determining the job positions and salary, if any, they were denied because of race or other discriminatory practices to which they were subjected, shall make findings and recommendations with respect to their loss of income and other relief to which they are entitled.

12. The Court has already found that the defendants followed a pattern and practice of discrimination in promotions and involuntary terminations against black employees between July 4, 1974 and February 20, 1980. Once a class member shows that he is black, sought promotion, or would have sought promotion and was qualified to promote, or was involuntarily discharged, he or she will be presumptively entitled to an award of back pay based on the date the discriminatory act occurred. The defendant may offer evidence regarding the class members' qualifications or the qualifications of the persons selected, the nonavailability of the class members, the infractions of the company rules by the claimant or other evidence which will aid the Master in determining whether the class member has suffered from discriminatory practices of defendant because of race or color. The class members may offer evidence in rebuttal or otherwise to show that the defendant's explanation is pretextual. The Master shall base his recommendations on the facts he finds and applicable law.

13. The Master shall add pre-judgment and post-judgment interest to each monetary award at the rate set forth in the Judgment.

14. In each instance where the Master finds that a class member or individual was discriminated against unlawfully or unlawfully discharged or forced to terminate his or her employment, the Master shall receive evidence and make findings and recommendations as to any front pay the class member shall receive until placed in his or her rightful place. The Court has already enjoined the defendants to pay front pay to Porter, Lilly, Gregory, Mobley, McKinney, Torrence, Jones, Sullivan, Bailey, and LeGrand. The Master shall make findings and recommendations as to the front pay that should be awarded to these plaintiffs and class members.

15. The Master shall receive evidence and make findings and recommendations with respect to the injunctive relief that each class member and individual shall receive. The Court has previously awarded injunctive relief to Porter, Lilly, Gregory, Mobley, McKinney, Torrence, Jones, Sullivan, LeGrand, and Bailey. The Master may receive evidence and make findings and recommendations with respect to any additional injunctive relief that should be awarded to these individuals.

16. The following are general rules which should govern the Master's determinations:

(a) Facts found and conclusions of law reached by the Court will be accepted by the Master and will not be relitigated. The Master should familiarize himself with the Findings of Fact and Conclusions of Law and Judgment.

(b) In determining the class members who applied for promotion or transfer or who would have applied but for the defendant's practices, the Master must follow the decision of the Supreme Court in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

(c) In determining entitlement and back pay, front pay, and fringe benefits, the Master shall follow the instructions set out in *Teamsters, supra*; *White v. Carolina Paperboard Co.*, 564 F.2d 1073 (4th Cir. 1977), *Patterson v. American Tobacco Co.*, 535 F.2d 257 (4th Cir. 1975) and *Sledge v. J. P. Stevens & Co.*, 585 F.2d 625 (4th Cir. 1978). If the instructions set out in these opinions do not answer all questions that arise, the Master shall follow applicable law. Defendant shall be allowed to show the interim earnings of claimants any lack of diligence on their part to earn reasonable wages. Unemployment compensation, welfare payments, and the like shall not be set off against back pay, front pay, and fringes owed.

(d) The Master may require either party to submit such additional data or information as may be necessary or helpful for the Master's determination.

(e) This Order does not preclude agreement otherwise between the parties. Such agreement is encouraged.

(f) Proceedings before the Master shall not be stayed except by order of the Master or order of the Court. Application by a party for action by the Court does not stay proceedings before the Master.

(g) The Federal Rules of Civil Procedure and of Evidence shall govern proceedings before the Master. The Master may hold such other hearings and issue such other orders as may be appropriate for the orderly and efficient performance of his duties and are not inconsistent with prior orders of this Court or controlling case law.

17. All costs, counsel fees, and expenses incurred by plaintiffs and class members, and the fees and expenses of the Master, which are necessary and reasonable for the proceedings before the Master, shall be taxed against the defendant. The Court will determine reasonable fees, costs, and expenses upon motion of counsel.

18. This Order may be corrected or amended as the Court may find appropriate.